# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

**FILED**

**December 30, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

MARGARET WHITE and )
MURL WHITE, )
)
    Plaintiffs/Appellants, )
)
VS. )
)
THE VANDERBILT UNIVERSITY, ) Davidson Circuit
THE VANDERBILT UNIVERSITY d/b/a ) No. 92C-2740
VANDERBILT UNIVERSITY MEDICAL )
CENTER and VANDERBILT UNIVERSITY )
HOSPITAL, DAN SPENGLER, M.D., ) Appeal No.
R. BRADLEY WYRSCH, M.D., ) M1997-00105-COA-R3-CV
MICHAEL CHMELL, M.D., and )
CLEMENT JONES, M.D., )
)
    Defendants/Appellees. )

## IN THE CIRCUIT COURT FOR DAVIDSON COUNTY
## AT NASHVILLE, TENNESSEE

### THE HONORABLE THOMAS W. BROTHERS, JUDGE

For Plaintiffs/Appellants:

Jeffrey A. Garrety
LAW OFFICES OF JEFFREY A. GARRETY
Jackson, Tennessee

Larry D. Ashworth
David E. High
ASHWORTH & HIGH
Nashville, Tennessee

For Defendants/Appellees:

H. Lee Barfield
Steven E. Anderson
E. Clifton Knowles
BASS, BERRY & SIMS
Nashville, Tennessee

## REVERSED IN PART AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# O P I N I O N

This medical malpractice action stems from a rare post-operative complication of back surgery called the cauda equina syndrome. A patient diagnosed with the syndrome filed suit in the Circuit Court for Davidson County alleging that four physicians and the hospital where her back surgery was performed had caused her permanent injury by negligently failing to monitor, diagnose, and treat her post-operative condition. The trial court granted summary judgment for one physician and directed verdicts for two others, and a jury returned a verdict for the remaining physician and the hospital. We have determined that the directed verdicts for two of the physicians and the jury's verdict for the hospital and one other physician must be set aside because the court erroneously prevented the patient from using at trial the depositions of one of the defendants' designated expert witnesses.

## I.

Margaret White and her husband of almost fifty years live in Jackson, Tennessee. Mr. White is a retired railroad conductor, and Ms. White retired as a salesperson in 1983 to take care of her mother. Prior to the events giving rise to this lawsuit, Ms. White had generally been in good health and had been devoting most of her time and energy to homemaking, gardening, church activities, and serving as a Red Cross volunteer at a local hospital.

After Ms. White began to experience lower back pain, she consulted several Jackson-area physicians who determined that surgery was indicated but who also recommended that the surgery be postponed for a time. As Ms. White's back pain worsened, she consulted Dr. Dan M. Spengler, a Nashville orthopaedic surgeon. Dr. Spengler diagnosed Ms. White's condition as spinal stenosis[1] and recommended surgery. On October 25, 1991, Dr. Spengler and Dr. Clement K. Jones, a fellow in spinal surgery, performed the surgery at Vanderbilt University Medical Center. The surgery was a success and is not the subject of this litigation.

Ms. White's post-operative recovery was uneventful for the first two days following surgery. At 11:00 p.m. on Sunday, October 27, 1991, Catalina Baun, Ms. White's nurse, conducted a neurovascular examination with normal results. However, four hours later at

---

[1]Spinal stenosis is the narrowing or compression of the portion of the vertebral canal where the cauda equina is located. The cauda equina is the "bundle of spinal nerve roots arising from the lumbar enlargement and conus medullaris and running through the lower part of the subarachnoid space within the vertebral canal below the first lumbar vertebra; it comprises the roots of all the spinal nerves below the first lumbar vertebra." Stedman's Medical Dictionary 238 (5th unabr. law. ed. 1982).

approximately 4:00 a.m. on October 28, 1991, Ms. White asked her husband to summon Ms. Baun because she was suffering from pain in her lower buttocks and right leg that "was just so bad, I could hardly stand it."

Ms. Baun, following standard physician's orders, gave Ms. White pain medication. At 4:18 a.m., Ms. Baun paged Dr. Robert Bradley Wyrsch, the junior resident orthopaedic physician on duty, because Ms. White's pain had not lessened. A dispute exists concerning whether Ms. Baun told Dr. Wyrsch that Ms. White's symptoms were new and progressive. Dr. Wyrsch simply instructed Ms. Baun to give Ms. White more pain medication. Approximately two hours later, between 6:00 and 6:30 a.m., Ms. White was examined for the first time by Dr. Michael J. Chmell, a second-year orthopaedic resident. Dr. Chmell ordered more pain medication and asked Dr. Jones, who had assisted Dr. Spengler during Ms. White's surgery, to examine Ms. White.

Dr. Jones eventually examined Ms. White between 8:15 and 8:30 a.m. and diagnosed her condition as cauda equina syndrome,[2] a rare complication of spinal surgery. Dr. Jones summoned Dr. Spengler who conducted his own examination and ordered an emergency myelogram to confirm the location of the compression. At 11:30 a.m., the physicians reviewed the myelogram, and at 12:35 p.m., Ms. White underwent emergency surgery.

Because of these post-operative complications, Ms. White lost bowel and bladder control and suffered back pain for several months. She still experiences pain and discomfort that interferes with daily activities such as sitting, standing, walking, and sexual relations. She also underwent a colostomy and has been required to catheterize herself because of her bladder problems.

The Whites filed a malpractice suit in the Circuit Court for Davidson County against Drs. Spengler, Jones, Wyrsch, and Chmell and Vanderbilt University Medical Center, seeking to recover damages for the delay in diagnosing and treating the causa equina syndrome. The trial court granted Dr. Chmell a summary judgment prior to trial and directed verdicts for Drs. Spengler and Wyrsch at the close of the plaintiff's proof. Thereafter, the jury returned a verdict for Dr. Jones and Vanderbilt University Medical Center. On this

---

[2]Cauda equina compression syndrome is caused by "either a herniated disc, or an epidural hematoma or abscess that is compressing the caudal sack. Emergent surgical intervention is required to prevent permanent neurologic damage. Symptoms include incontinence, bilateral sciatica and motor weakness of the lower extremities, saddle anesthesia (partial or complete loss of sensation in the portion of the buttocks, perineum and thighs that would come into contact with a saddle when riding a horse) and even paraplegia." 5 Attorneys' Textbook of Medicine ¶ 15.33 (Roscoe N. Gray & Louise J. Gordy eds. 3d ed. 1999). Ms. White's compression was the result of an epidural hematoma.

appeal, the Whites take issue with the trial court's refusal to permit them to use the deposition testimony of one of the defendants' experts designated as a testifying witness, the directed verdicts for Drs. Spengler and Wyrsch, and the trial court's refusal to strike the testimony of one of the defendants' experts.[3]

## II.

### THE EXCLUSION OF DR. JOHN P. KOSTUIK'S DEPOSITION TESTIMONY

We first take up the question regarding the Whites' efforts to introduce portions of the depositions of one of the defendants' designated experts during their case-in-chief, as well as their desire to use these depositions in rebuttal and to cross-examine the defendants' other expert witnesses. The trial court held that the Whites could not use these depositions for any purpose until the defendants actually called the expert as a witness. We disagree.

### A.

After the Whites filed suit, the defendants enlisted the assistance of Dr. John P. Kostuik, an orthopaedic surgeon recognized nationally as an expert on the development and treatment of cauda equina syndrome.[4] Because Dr. Kostuik lives and practices in Maryland, the defendants sought and obtained a judicial waiver of the locality rule[5] to enable him to testify.[6] The Whites first deposed Dr. Kostuik by telephone on August 21, 1996. During this deposition, Dr. Kostuik opined that Ms. Baun and Dr. Wyrsch should have conducted their own neurovascular examination of Ms. White after she began complaining of pain at 4:00 a.m. on October 28, 1991. In addition, he stated that Ms. White's condition should have been diagnosed earlier than 8:30 a.m. and that obtaining the myelogram caused an unnecessary delay of the remedial surgery.

---

[3]The Whites are not taking issue with the summary judgment for Dr. Chmell.

[4]Dr. Kostuik has published numerous articles on the cauda equina syndrome. *See, e.g.*, John P. Kostuik, *Cauda Equina Syndrome: The Lumbar Spine* (1996); John Kostuik, *Controversies in Cauda Equina Syndrome and Lumbar Disk Herniation*, 4(2) Spine 125 (Apr. 1993); John P. Kostuik et al., *Cauda Equina Syndrome and Lumbar Disk Herniation*, 68A Journal of Bone and Joint Surgery 386 (March 1986).

[5]*See* Tenn. Code Ann. § 29-26-115(b) (1980).

[6]In their motion to waive the locality rule, the defendants represented to the trial court that Dr. Kostuik has written the "preeminent medical article on the development and treatment of cauda equina syndrome" and that the "results of Kostuick's [sic] study are of great significance in refuting plaintiff's [sic] theory in this case that the defendants acted too slowly in conducting surgery in response to plaintiff's presentation of cauda equina syndrome." In a supporting affidavit, Dr. Spengler stated that Dr. Kostuik's study "may affect a determination as to the applicable standard of care in this case and may help refute plaintiffs' theory that earlier surgical intervention on Ms. White would have spared her any injury."

Despite Dr. Kostuik's seemingly adverse testimony during the telephone deposition, the defendants decided to obtain a videotaped deposition from Dr. Kostuik for possible use at trial. Accordingly, the parties' lawyers traveled to Baltimore and again deposed Dr. Kostuik on August 29, 1996. On this occasion, Dr. Kostuik repeated that Ms. Baun should have performed a nursing neurovascular examination on Ms. White at 4:00 a.m. and that Dr. Wyrsch should have examined Ms. White when he first received Ms. Baun's call. He also stated that Dr. Jones's response had not been prompt and that there was no "absolute indication" than a myelogram needed to be performed.

The Whites listed Dr. Kostuik as one of their potential witnesses on their witness list filed on September 3, 1996, and also disclosed that Dr. Kostuik's two depositions were among the exhibits they planned to introduce at trial. On the following day, the defendants filed their witness and exhibit list stating that Dr. Kostuik was among the witnesses "who may be called to testify."

When the trial commenced on September 9, 1996, the Whites requested the trial court to limit the number of expert witnesses called by the defendants. The defendants sought to head off the Whites' use of Dr. Kostuik's testimony by filing motions in limine to prevent the Whites from using Dr. Kostuik's depositions and from alluding to the substance of any of their experts' testimony during voir dire, opening statements, or during the cross-examination of any other defense witness. During a hearing on these motions, the defendants informed the trial court that Dr. Kostuik was "particularly important in terms of causation" and that Dr. Kostuik would testify in person if called as a witness. Based on these representations, the trial court declined to grant the Whites' motion to limit the number of the defendants' witnesses. The court also ruled that the Whites could not use Dr. Kostuik's depositions in their case-in-chief but reserved deciding whether to permit them to use the depositions in rebuttal or during their cross-examination of the defendants' expert witnesses.

The subject of Dr. Kostuik's deposition resurfaced on September 13, 1996 before the defendants began to present their evidence. The trial court inquired whether the parties had found any additional authorities regarding the permissible use of the depositions. After the parties restated their positions, the trial court decided that it was not ready to rule on the use of Dr. Kostuik's depositions but indicated that it was inclined to permit the Whites to use them for cross-examination and rebuttal with some limitations.

At the beginning of the next day of trial, the trial court ruled definitively that the Whites could not use Dr. Kostuik's depositions for rebuttal if the defendants did not call him as a witness. However, the trial court held that the Whites could use the depositions during

their cross-examination of the defendants' experts as long as they established that the witness had read Dr. Kostuik's depositions and they avoided mentioning that Dr. Kostuik had originally been the defendants' witness. Later, the trial court modified its holding by stating that "unless that expert is going to be called to testify at trial, a party has the right to designate . . . [him] as a consultant at any point. And once they [the defendants] elect not to utilize . . . [the expert] at trial, the other party may not . . . discover the opinions. And if they have been discovered, if there have been depositions, [the other party] . . . may not utilize those depositions at trial."

## B.
### STANDARDS FOR REVIEWING EVIDENTIARY DECISIONS

The admission or exclusion of evidence is within the trial court's discretion. *See Seffernick v. Saint Thomas Hosp.*, 969 S.W.2d 391, 393 (Tenn. 1998); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992). The discretionary nature of the decision does not shield it completely from appellate review but does result in subjecting it to less rigorous appellate scrutiny. *See Tennessee Dep't of Health v. Frisbee*, No. 01A01-9511-CH-00540, 1998 WL 4718, at *2 (Tenn. Ct. App. Jan. 9, 1998) (No Tenn. R. App. P. 11 application filed); *BIF v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *2 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed). Because, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen. *See Overstreet v. Shoney's, Inc.*, ___ S.W.3d ___, ___ (Tenn. Ct. App. 1999).[7]

Discretionary decisions require conscientious judgment. *See BIF v. Service Constr. Co.*, 1988 WL 72409, at *2. They must take the applicable law into account and must also be consistent with the facts before the court. *See Overstreet v. Shoney's, Inc.*, ___ S.W.3d at ___. Appellate courts will set aside a discretionary decision only when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence. *See Overstreet v. Shoney's, Inc.*, ___ S.W.3d at ___. Thus, a trial court's discretionary decision should be reviewed to determine: (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives. *See BIF v. Service Constr. Co.*, 1988

_____

[7]*See Overstreet v. Shoney's, Inc.*, No. 01A01-9612-CV-00566, 1999 WL 355912, at *11 (Tenn. Ct. App. June 4, 1999) (Tenn. R. App. P. 11 application denied Oct. 4, 1999).

WL 72409, at *3. Appellate courts should permit a discretionary decision to stand if reasonable judicial minds can differ concerning its soundness. *See Overstreet v. Shoney's, Inc.*, ___ S.W.3d at ___.

Concluding that a trial court improperly excluded otherwise admissible evidence does not end the inquiry. The erroneous exclusion of evidence will not require reversal of the judgment if the evidence would not have affected the outcome of the trial even if it had been admitted. *See Hensley v. Harbin*, 782 S.W.2d 480, 482 (Tenn. Ct. App. 1989); *Pankow v. Mitchell*, 737 S.W.2d 293, 298 (Tenn. Ct. App. 1987).

## C.
### THE DISCOVERY OF THE OPINIONS OF AN OPPONENT'S EXPERT

The Tennessee Rules of Civil Procedure permit the discovery of relevant, non-privileged information. *See Wright v. United Servs. Auto Ass'n*, 789 S.W.2d 911, 915 (Tenn. Ct. App. 1990); *Duncan v. Duncan*, 789 S.W.2d 557, 560 (Tenn. Ct. App. 1990). They strike a balance between two important policies. The first, and perhaps most important, policy is that discovery should enable the parties and the courts to seek the truth so that disputes will be decided by facts rather than by legal maneuvering. *See Harrison v. Greeneville Ready-Mix, Inc.*, 220 Tenn. 293, 302, 417 S.W.2d 48, 52 (1967); *Pettus v. Hurst*, 882 S.W.2d 783, 786 (Tenn. Ct. App. 1993). The second policy is that the discovery rules should not permit less diligent lawyers to benefit from the work of their more diligent opponents. *See Vythoulkas v. Vanderbilt Univ. Hosp.*, 693 S.W.2d 350, 357 (Tenn. Ct. App. 1985). Both these policies are evident in the rules governing the discovery of experts.

The courts and commentators generally divide experts into four classifications for discovery purposes.[8] The first classification includes experts a party expects to call at trial. At the time of this proceeding, Tenn. R. Civ. P. 26.02(4)(A) permitted the party's opponents to learn by interrogatories the names of these experts and the substance of their testimony. Further discovery of these experts could be obtained only by agreement or on motion and court order.[9]

---

[8]*See* 8 Charles A. Wright, et al., *Federal Practice and Procedure* § 2029, at 428-29 (2d ed. 1994). This treatise notes that Fed. R. Civ. P. 26 draws a distinction between experts who have been retained or specifically employed in anticipation of litigation or preparation for trial but who are not expected to testify and experts who have been consulted informally but who have not been retained. Tenn. R. Civ. P. 26 does not draw this distinction.

[9]In 1997, the Tennessee Supreme Court amended Tenn. R. Civ. P. 26.02(4)(A)(ii) to permit depositions of experts as a matter of right.

The second classification includes experts, whether retained or not, who have been consulted by a party in anticipation of litigation or in preparation for trial but who will not be called as a witness. Except as provided in Tenn. R. Civ. P. 35 pertaining to examining physicians, Tenn. R. Civ. P. 26.02(4)(B) provides that neither the identity of these experts nor their opinions can be discovered without a showing that "the party seeking discovery cannot obtain facts or opinions on the same subject by other means."

The third classification includes experts who were not specifically retained in anticipation of litigation or in preparation for trial, such as regular employees of a party or treating physicians. Because these experts do not fit within Tenn. R. Civ. P. 26.02(4)(A) or 26.02(4)(B), their identity, as well as their facts and opinions, are freely discoverable as with any ordinary witness. *See Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 258 (Tenn. Ct. App. 1990); *Alessio v. Crook*, 633 S.W.2d 770, 779-80 (Tenn. Ct. App. 1982).

The fourth classification includes experts designated by a party as a witness expected to testify at trial but whose designation is subsequently withdrawn.[10] The designation of these experts as testifying witnesses, even if that designation is subsequently withdrawn, takes an opposing party's demand to depose and use the expert at trial out of the requirements of Tenn. R. Civ. P. 26.02(4)(B). However, the Tenn. R. Civ. P. 26.02(4)(A) designation does not automatically entitle the opposing party to depose or use another party's expert at trial. Rather, the trial court must use its discretion, guided by Tenn. R. Evid. 403's balancing of probative value against prejudice, to determine whether the opposing party should be permitted to call or depose or use the other party's expert at trial. *See House v. Combined Ins. Co. of Am.*, 168 F.R.D. 236, 245-46 (N.D. Iowa 1996).

Shielding consulting experts from discovery runs contrary to the broad policy favoring the discovery of non-privileged information; however, it serves several other legitimate

---

[10]Courts construing rules similar to Tenn. R. Civ. P. 26 have held that a party may place a previously designated testifying expert beyond the reach of an opposing party by redesignating the expert from a testifying witness to a consultant prior to the witness's deposition. *See Ross v. Burlington Northern R.R.*, 136 F.R.D. 638, 638-39 (N.D. Ill. 1991); *County of Los Angeles v. Superior Court*, 271 Cal. Rptr. 698, 703-04 (Ct. App. 1990); *Reeves v. Boyd & Sons, Inc.*, 654 N.E.2d 864, 874-75 (Ind. Ct. App. 1995); *General Motors Corp. v. Jackson*, 636 So. 2d 310, 313-14 (Miss. 1992). Some courts, however, will not give this effect to the redesignation of a testifying expert if they determine that the parties are undertaking to suppress evidence or seeking to shield the expert witness from discovery for any other improper purpose that violates the clear purpose and intent of the discovery rules. *See In re Doctors' Hosp. of Loredo*, 2 S.W.3d 504, 506 (Tex. App. 1999); *Castellanos v. Littlejohn*, 945 S.W.2d 236, 239-40 (Tex. App. 1997). Likewise, courts have held that the redesignation of an expert witness does not affect right of discovery for examining physicians under Tenn. R. Civ. P. 35, s*ee Kennedy v. Superior Court*, 75 Cal. Rptr. 2d 373, 375 (Ct. App. 1998); *Pinkett v. Brittingham*, 567 A.2d 858, 860 (Del. 1989), and that an expert cannot be designated as a testifying expert for some purposes and a consulting expert for others. *See Furniture World, Inc. v. D.A.V. Thrift Stores, Inc.*, 168 F.R.D. 61, 63 (D.N.M. 1996).

interests. It encourages lawyers to seek expert advice to properly evaluate and present their client's position. *See Rocky Mountain Nat'l Gas Co. v. Cooper Indus., Inc.*, 166 F.R.D. 481, 482 (D. Colo. 1996); *McKinnon v. Smock*, 445 S.E.2d 526, 528 (Ga. 1994); *Tom L. Scott, Inc. v. McIlhaney*, 798 S.W.2d 556, 559 (Tex. 1990). Without this protection, parties would be reluctant to consult experts because they would be forced to live or die based on the unknown opinion of the expert consulted. *See General Motor Corp. v. Gayle*, 924 S.W.2d 222, 230 (Tex. App. 1996). It also prevents the unfairness of permitting a party to benefit from the opposing party's efforts and expense. *See Durflinger v. Artiles*, 727 F.2d 888, 891 (10th Cir. 1984). In addition, shielding consulting witnesses from discovery helps assure the availability of experts who will assist with litigated disputes and minimizes the prejudice caused by revealing the prior retention of an expert by the opposing party. *See Rubel v. Eli Lilly & Co.*, 160 F.R.D. 458, 460 (S.D.N.Y. 1995).

Most of the reasons in favor of shielding a consulting expert from discovery become attenuated once a party identifies or designates an expert as a witness expected to testify at trial. Identifying an expert as a testifying witness in accordance with Tenn. R. Civ. P. 26.02(4)(A) has the practical effect of waiving the protection of Tenn. R. Civ. P. 26.02(4)(B), *see Brown v. Hamid*, 856 S.W.2d 51, 54 (Mo. 1993), and of making the expert available to be deposed. *See Brown v. Ringstad*, 142 F.R.D. 461, 465 (S.D. Iowa 1992); *In re Shell Oil Refinery*, 132 F.R.D. 437, 440 (E.D. La. 1990). Once an expert has been deposed, the limitation on the discovery of consulting experts has little or no application, *see Agron v. Trustees of Columbia Univ.*, 176 F.R.D. 445, 449 (S.D.N.Y. 1997), and the expert is recognized as presenting part of the common body of discoverable and generally admissible information and testimony available to all parties. *See House v. Combined Ins. Co. of Am.*, 168 F.R.D. at 245.

While Dr. Kostuik may once have been a consulting expert, the defendants eventually designated him as a testifying expert pursuant to Tenn. R. Civ. P. 26.02(4)(A). Not only did they designate him as a testifying expert, they voluntarily made him available for two depositions – one of the depositions to preserve his testimony because of his legal unavailability. In addition, the lawyers representing the defendants participated in these depositions without objection. Instead of attempting to redesignate Dr. Kostuik as a consulting expert following his depositions, the defendants repeatedly reinforced Dr. Kostuik's status as a testifying expert by including him on their list of potential trial witnesses and alluding to his expected appearance in court to testify in person.

Based on these facts, we find that Tenn. R. Civ. P. 26.02(4)(B) is inapplicable to the defendants' motion in limine for two reasons. First, Tenn. R. Civ. P. 26.02(4)(B) governs

limitations on discovery, not on the admissibility of properly discovered evidence. Second, this record contains no evidence that the Whites abused the discovery process or that they learned of Dr. Kostuik's identity or opinions through any means inconsistent with either the letter or the spirit of the discovery rules. Because Tenn. R. Civ. P. 26.02(4)(B) is inapplicable, all that is left for the court to do is to determine the admissibility of Dr. Kostuik's depositions under the applicable provisions of the Tennessee Rules of Civil Procedure and the Tennessee Rules of Evidence. *See Argon v. Trustees of Columbia Univ.*, 176 F.R.D. at 449-50; *Rubel v. Eli Lilly & Co.*, 160 F.R.D. at 460-61 (both cases finding that in the absence of discovery abuse, the admissibility of expert testimony is governed by Fed. R. Evid. 403).

## D.
### THE ADMISSIBILITY OF DR. KOSTUIK'S TESTIMONY AT TRIAL

The Whites' request to read portions of Dr. Kostuik's depositions into evidence and to use the depositions to cross-examine the defendants' experts triggers the consideration of three issues. First, we must determine whether, under the facts of this case, Tenn. R. Civ. P. 32 permitted the use of deposition testimony at trial. Second, we must decide whether the portions of Dr. Kostuik's testimony that the Whites' desired to use were relevant. Third, we must determine whether the probative value of the portions of the depositions the Whites proposed to use outweighs the possible prejudice to the defendants. We decide each of these questions in the Whites' favor.

### 1.
### USE OF DR. KOSTUIK'S DEPOSITIONS

We turn first to the question of whether the Whites could have used Dr. Kostuik's deposition at trial. Tenn. R. Civ. P. 32.01(3) provides that the deposition of a witness may be used at trial for any purpose if the court finds that the witness is either at a greater distance than one hundred miles from the place of the trial or that the witness is out of the state. Dr. Kostuik meets both criteria because he resides and works in Baltimore, Maryland. Accordingly, because there is no evidence that the Whites procured his absence, Dr. Kostuik's status as a witness satisfies the distance and geographic requirements in Tenn. R. Civ. P. 32.01(3).

Tenn. R. Civ. P. 32.01(3) also provides that depositions of experts taken pursuant to the provisions of Tenn. R. Civ. P. 26.02(4) may only be used at trial to impeach the testimony of the deponent. The comments to Tenn. R. Civ. P. 32.01 make clear that this restriction applies only to discovery depositions of an adversary's expert. *See* Tenn. R. Civ. P. 32.01 advisory commission cmt. to 1986 amendment. Dr. Kostuik's videotaped deposition of August 29, 1996 was not a discovery deposition taken by the Whites but rather was a deposition taken at the defendants' insistence to preserve Dr. Kostuik's testimony. Accordingly, this deposition meets the requirements of Tenn. R. Civ. P. 32.01(3). Dr. Kostuik's telephone deposition of August 21, 1996 was a discovery deposition taken by the Whites. Rather than being completely inadmissible, however, it can be used to impeach Dr. Kostuik's testimony in his August 29, 1996 deposition.

Having determined that Dr. Kostuik's depositions satisfy the conditions for use at trial in Tenn. R. Civ. P. 32.01, we must still determine whether the deposition testimony would be admissible under the applicable rules of evidence if Dr. Kostuik were to have given the same testimony live in the courtroom.[11] The answer to this question requires us to consider two rules of evidence – Tenn. R. Evid. 401 and 403.

## 2.
### THE RELEVANCE OF DR. KOSTUIK'S TESTIMONY

This is a medical malpractice action. To prevail, the Whites had to present expert evidence (1) establishing the applicable standard of care, (2) demonstrating that the defendants' conduct fell below that standard of care, and (3) that the defendants' conduct was the proximate cause of injuries that would not otherwise have occurred. *See* Tenn. Code Ann. § 29-26-115(a) (1980); *Moon v. Saint Thomas Hosp.*, 983 S.W.2d 225, 229 (Tenn. 1998); *Hurst v. Dougherty*, 800 S.W.2d 183, 185 (Tenn. Ct. App. 1990).[12] Accordingly, it was incumbent on the Whites to present expert testimony regarding the standard of care of the nurse and the four physicians treating Ms. White on October 27 and 28, 1991 and whether the conduct of these health care providers at that time fell below the applicable

---

[11]The deposition is not subject to a hearsay objection. *See* Tenn. R. Evid. 804(b)(1).

[12]Negligence and causation are normally required to be established by expert medical testimony. *See Kennedy v. Holder*, 1 S.W.3d 670, 672 (Tenn. Ct. App. 1999); *Stokes v. Leung*, 651 S.W.2d 704, 706 (Tenn. Ct. App. 1982). However, the need for expert medical proof can be dispensed with when the acts of negligence are so obvious that they come within the common knowledge of laypersons. *See Ayers v. Rutherford Hosp., Inc.*, 689 S.W.2d 155, 160 (Tenn. Ct. App. 1984). The common knowledge exception to Tenn. Code Ann. § 29-26-115 is inapplicable in this case.

standard of care and caused Ms. White to sustain injuries that she would not otherwise have suffered.

In light of the Whites' burden of proof, there is little need for a prolonged discussion concerning whether Dr. Kostuik's testimony is relevant to their case. Tenn. R. Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Dr. Kostuik's testimony relates to the issues of the applicable standard of care for the health care providers treating Ms. White, as well as to the issues of breach of this standard of care and causation. Because each of these issues was hotly contested, there is no question that Dr. Kostuik's testimony was relevant to the issues at trial.

## 3.
### BALANCING UNDER TENN. R. EVID. 403

We now turn to the balancing of the probative value of Dr. Kostuik's testimony against the countervailing factors identified in Tenn. R. Evid. 403. This balancing process has several general ground rules. It begins by recognizing that the rules of evidence favor the admissibility of relevant evidence, *see* 10 James W. Moore et al., *Moore's Federal Practice* § 403.02[3] (2d ed. 1995), and that relevant evidence is admissible unless otherwise provided. *See* Tenn. R. Evid. 402; *Phillips v. F.W. Woolworth Co.*, 867 S.W.2d 316, 318 (Tenn. Ct. App. 1992). Thus, excluding relevant evidence under Tenn. R. Evid. 403 is an extraordinary remedy that should be used sparingly, *see United States v. Rodriguez*, 192 F.3d 946, 949 (10th Cir. 1999); *Caparotta v. Entergy Corp.*, 168 F.3d 754, 758 (5th Cir. 1999); *Westcott v. Crinklaw*, 68 F.3d 1073, 1077-78 (8th Cir. 1995); *Trevino v. Texas Dep't of Protective & Regulatory Servs.*, 893 S.W.2d 243, 248 (Tex. App. 1995); *Towner v. State*, 685 P.2d 45, 49 (Wyo. 1984), and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion. *See* Neil P. Cohen et al., *Tennessee Law of Evidence* § 403.3, at 152 (3d ed. 1995) ("Tennessee Law of Evidence").

Each Tenn. R. Evid. 403 question must be decided on its own facts, *see* Tennessee Law of Evidence § 403.7, at 156, and the trial court must be careful not to usurp the function of the jury in the process. *See* 22 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5220, at 306 (1978) ("Wright & Graham"). The balancing process under Tenn. R. Evid. 403 is a two-step process. The trial court must first balance the probative value of the evidence sought to be excluded against the countervailing factors. After the court has engaged in the balancing analysis, it may then exercise its discretion to

determine whether the evidence should be excluded if the prejudice substantially outweighs the probative value of the evidence. *See* Wright & Graham § 5214, at 264.

During the first phase of the analysis, the court must determine whether the countervailing factors in Tenn. R. Evid. 403 "substantially outweigh" the probative value of the evidence. The trial court has no discretion to exclude evidence under Tenn. R. Evid. 403 unless it concludes that the probative worth of the evidence is substantially outweighed by one or more of the countervailing factors. *See* Wright & Graham § 5214, at 263. Thus, a trial court should not exclude evidence under Tenn. R. Evid. 403 when the balance between the probative worth of the evidence and the countervailing factors is fairly debatable. *See* Wright & Graham § 5221, at 309.

The trial court's decision to exclude Dr. Kostuik's deposition must be viewed in light of the circumstances at the trial. When the trial began, the Whites had indicated that their case would rest on the expert testimony of a Knoxville neurosurgeon, a nurse from Jackson, and portions of Dr. Kostuik's depositions.[13] At the same time, the defendant physicians and the hospital had signaled their intention to call three out-of-state physicians, including Dr. Kostuik, and three nurses to testify about the standard of care and causation issues. In addition to these experts, each of the defendants intended to give their expert opinion that they were not negligent and that their actions or inactions did not cause Ms. White to suffer an injury she would not otherwise have suffered.

The probative value of Dr. Kostuik's opinions regarding the actions of Ms. Baun, Dr. Wyrsch, Dr. Jones, and Dr. Spengler is significant because it is consistent with the expert opinion of the only neurosurgeon testifying for the Whites. Dr. Kostuik questioned Ms. Baun's and Dr. Wyrsch's failure to examine Ms. White when she reported the new pain in her legs. He also observed that Dr. Jones's two-hour delay in examining Ms. White was "probably" not prompt and that Dr. Spengler could have proceeded to perform the emergency surgery without the myelogram.

The value of this evidence must now be weighed against the six countervailing factors in Tenn. R. Evid. 403. Three of these, undue delay, waste of time, and the needless presentation of cumulative evidence, can be quickly discounted. Permitting the Whites to use Dr. Kostuik's depositions would not have delayed the trial or wasted time. The Whites already had the depositions in hand and reading the relevant portions into the record would

---

[13]The Whites also indicated that they intended to rely on either the testimony of or portions of the depositions of the defendant physicians. It is obvious that the Whites did not intend to use these depositions with regard to the issues of standard of care or causation.

not have taken an appreciable amount of time. Likewise, Dr. Kostuik's deposition testimony would not have been cumulative. The trial court had earlier concluded, at the defendants' insistence, that Dr. Kostuik's testimony was not cumulative when it declined to grant the Whites' motion at the beginning of the trial to require the defendants to limit the number of their expert witnesses. Just as Dr. Kostuik's testimony would not have been cumulative had it been used by the defendants, it would not have been cumulative if used by the Whites.

Two of the remaining Tenn. R. Evid. 403 countervailing factors are confusion of the issues and misleading the jury. Dr. Kostuik's testimony does not run afoul of these factors either. His testimony concerning the applicable standard of care and causation is focused and directly on point. His answers are responsive to the questions and are couched in terms that can be easily understood by the lay persons on the jury. Considering both his testimony as a whole, as well as the portions of the testimony the Whites sought to use at trial, we find that Dr. Kostuik's testimony would have materially assisted the trier of fact.

The final countervailing factor in Tenn. R. Evid. 403 is the danger of unfair prejudice. At the outset, we find that the substance of much of Dr. Kostuik's deposition testimony does not create a danger of unfair prejudice to the defendants. This is certainly the case with regard to his testimony concerning the standard of care and causation issues. However, the Whites argue in their brief that in addition to presenting Dr. Kostuik's opinions regarding the matters at issue in the case, they should have been permitted to disclose to the jury that Dr. Kostuik had originally been retained by the defendants. That information raises substantial fairness concerns.

Informing the jury that an expert witness was originally retained by the opposing party creates a danger that the jury will draw two unwarranted conclusions. First, it could create the unwarranted impression that the opposing party is suppressing evidence that it had an obligation to present. *See Granger v. Wisner*, 656 P.2d 1238, 1242-43 (Ariz. 1982); 8 Charles A. Wright et al., *Federal Practice and Procedure* § 2032, at 447 (2d ed. 1994) (characterizing this information as "explosive"). Second, it could induce the jury to believe that the expert is somehow more credible than the other experts. Accordingly, we have held that the information concerning who originally hired an expert witness is irrelevant. *See State v. Wilkinson-Snowden-McGehee, Inc.*, 571 S.W.2d 842, 843 (Tenn. Ct. App. 1978). A majority of jurisdictions considering the question have held that it is improper to elicit on direct examination of an expert witness that the expert was originally retained by the opposing party. *See Peterson v. Willie*, 81 F.3d 1033, 1037-38 (11th Cir. 1996); *House v. Combined Ins. Co. of Am.*, 168 F.R.D. at 248; *Rubel v. Eli Lilly & Co.*, 160 F.R.D. at 460;

*Granger v. Wisner*, 656 P.2d at 1242; *General Motors Corp. v. Jackson*, 636 So. 2d at 314-15; *Seeber v. Howlette*, 586 N.W.2d 445, 451 (Neb. 1998).[14]

We have determined that the majority rule that disfavors informing the jury that an expert witness was originally retained by an opposing party is most consistent with the balancing requirements of Tenn. R. Evid. 403. Accordingly, the trial court should have permitted the Whites to use Dr. Kostuik's deposition at trial but should have required them to edit the portions of the deposition they planned to use to remove any reference to the fact that Dr. Kostuik had been initially consulted by the defendants. Removal of references to this information eliminates any real risk of danger of unfair prejudice to the defendants by permitting the Whites to use Dr. Kostuik's depositions at trial.[15]

Under the facts of this case, we find that the possible harm to the defendants from permitting the Whites to use Dr. Kostuik's deposition at trial does not substantially outweigh the probative value of the evidence. The defendants designated Dr. Kostuik as a testifying expert witness in accordance with Tenn. R. Civ. P. 26.02(4)(A) and never withdrew this designation. The manner in which the Whites obtained Dr. Kostuik's deposition complied with the letter and the spirit of the discovery rules. Accordingly, the trial court erred by refusing to allow them to rely on Dr. Kostuik's deposition at trial.

Finally, we must determine whether the trial court's error in excluding Dr. Kostuik's deposition has harmless. Under the facts of this case, the trial court's decision worked an injustice on the Whites by preventing them from introducing relevant evidence to support their medical malpractice claim. Given the closeness of the case and the weight of the expert proof against their claim, we conclude that the trial court's error, more probably than not,

---

[14]*But see Cogdell v. Brown*, 531 A.2d 1379, 1382 (N.J. Super. Ct. Law. Div. 1987); *Fenlon v. Thayer*, 506 A.2d 319, 323 (N.H. 1986) (holding that the identity of who originally retained an expert is material to the weight and credibility of the expert's testimony).

[15]The parties made Dr. Kostuik a central figure in this case whether he testified or not. His articles were mentioned in the presence of the jury on at least six occasions while Drs. Spengler and Jones and their physician expert were on the stand. During cross-examination, one of the Whites' lawyers asked Dr. Chmell if he was aware that the defendants had retained Dr. Kostuik to render an opinion in this case. While the trial court found that the question was improper, it concluded that the lawyer's reference to Dr. Kostuik's original employment had not been intentional. Simply mentioning which party originally retained a particular expert witness does not necessarily require reversal. *See Peterson v. Willie*, 81 F.3d at 1038. Other remedial action, such as curative or limiting instructions, may also be warranted in appropriate circumstances. In this case, the defendants did not request the trial court to give a curative instruction after the trial court admonished the Whites' lawyer about the question. Accordingly, we perceive no basis for holding that the Whites' lawyer's inadvertent statement should prevent them from obtaining relief from the trial court's erroneous decision to prevent them from using Dr. Kostuik's deposition at trial.

affected the outcome of the case. Therefore, we decline to find that the trial court's wrongful exclusion of Dr. Kostuik's testimony was harmless error.[16]

## III.

### DR. THOMAS WHITESIDES'S TESTIMONY

The Whites also argue that the trial court should have stricken Dr. Thomas Whitesides's testimony because he did not demonstrate sufficient knowledge and understanding of the key facts of the case. Decisions regarding the admission or exclusion of expert testimony are discretionary. *See McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997); *Lazy Seven Coal Sales, Inc. v. Stone & Hinds, P.C.*, 813 S.W.2d 400, 406-07 (Tenn. 1991); *Smith County v. Eatherly*, 820 S.W.2d 366, 368 (Tenn. Ct. App. 1991). Accordingly, we will not overturn a trial court's decision either to admit or to exclude expert testimony unless it was arbitrary or an abuse of discretion. *See Buchanan v. Harris*, 902 S.W.2d 941, 945 (Tenn. Ct. App. 1995); *Thomas v. Harper*, 53 Tenn. App. 549, 561, 385 S.W.2d 130, 136 (1964).

An expert witness qualified by "knowledge, skill, experience, training, or education" may testify to scientific, technical, or other specialized knowledge if it "will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." *See* Tenn. R. Evid. 702. A trial court may disallow expert testimony if the underlying facts or data show a lack of trustworthiness. *See* Tenn. R. Evid. 703. Though there is little Tennessee case law interpreting Tenn. R. Evid. 703, one panel of this court has suggested that an expert opinion with a weak factual foundation may be excluded if there is a danger that the jury might give the opinion more weight than it deserves. *See Knight v. Hospital Corp. Of Am.*, No. 01A01-9509-CV-00408, 1997 WL 5161, at *6 (Tenn. Ct. App. Jan. 8, 1997) (No Tenn. R. App. P. 11 application filed). Another panel has stated that "the obvious meaning of the rule is that an opinion may be excluded if it is based upon facts which are not adequately shown to be true." *Seffernick v. Saint Thomas Hospital*, No. 01A01-9606-CV-00282, 1996 WL 724914, at *3 (Tenn. Ct. App. Dec. 18, 1996), *rev'd on other grounds*, 969 S.W.2d 391 (Tenn. 1998).

---

[16]We must address a rather disingenuous argument in the defendants' brief to uphold the exclusion of Dr. Kostuik's testimony. The defendants argue that the trial court properly excluded the testimony because the Whites had not obtained a waiver of the locality rule. The Whites had no obligation to obtain this waiver because the defendants had already obtained the waiver from the trial court over the Whites' objections. The trial court based its decision to exclude Dr. Kostuik's testimony on a misapplication of Tenn. R. Civ. P. 26.02(4)(B) and Tenn. R. Evid. 403, not by applying the locality rule. By successfully seeking a waiver of the locality rule for their own benefit, the defendants effectively hoisted themselves on their own petard.

We are convinced that Dr. Whitesides's testimony, taken as a whole, meets the threshold requirements of admissibility. Though Dr. Whitesides stated on several occasions that he did not remember specific facts, his testimony indicates he was merely attempting to be careful in rendering his opinion. Dr. Whitesides's statements and questions show that he wanted to ensure that his testimony was not taken out of context. In no way does the record reflect a lack of knowledge and understanding of the facts such that his testimony should be stricken. An inability to remember specific facts goes to the weight of the evidence and not to its admissibility.

## IV.

### THE DIRECTED VERDICTS FOR DRS. SPENGLER AND WYRSCH

In their final issue, the Whites assert that the trial court erred by granting directed verdicts for Drs. Spengler and Wyrsch at the close of the plaintiffs' proof. The outcome of this issue is inextricably linked to the trial court's decision to exclude Dr. Kostuik's deposition. We have determined that Drs. Spengler and Wyrsch would not have been entitled to a directed verdict had Dr. Kostuik's deposition been considered.

A motion for directed verdict requires the trial court to determine whether, as a matter of law, the evidence is sufficient to create an issue for the jury to decide. *See Underwood v. Waterslides of Mid-America, Inc.*, 823 S.W.2d 171, 176 (Tenn. Ct. App. 1991). When faced with a motion for directed verdict, a trial court must take the strongest legitimate view of the evidence and allow all reasonable inferences in favor of the non-moving party, while discarding all evidence to the contrary. *See Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Dobson v. Shortt*, 929 S.W.2d 347, 349-50 (Tenn. Ct. App. 1996). Directed verdicts are proper only when reasonable minds, after considering the evidence, could reach only one conclusion. *See Eaton v. McClain*, 891 S.W.2d 587, 590 (Tenn. 1994); *Williams v. Brown*, 860 S.W.2d 854, 857 (Tenn. 1993). Thus, if there is any dispute as to material determinative evidence or any doubt as to conclusions to be drawn from the evidence, the motion must be denied. *See Hurley v. Tennessee Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App. 1995); *Souter v. Cracker Barrel Old Country Store, Inc.*, 895 S.W.2d 681, 683 (Tenn. Ct. App. 1994).

Reviewing courts do not weigh the evidence, *see Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d at 647; *Benton v. Snyder*, 825 S.W.2d 409, 413 (Tenn. 1992), or evaluate the credibility of the witnesses. *See Benson v. Tennessee Valley Elec. Coop.*, 868 S.W.2d 630, 638-39 (Tenn. Ct. App. 1993). Instead, they review the evidence most favorably to the party against whom the motion is made, give that party the benefit of all

reasonable inferences from the evidence, and also disregard all evidence contrary to that party's position. *See Eaton v. McClain*, 891 S.W.2d at 590; *Gann v. International Harvester Co.*, 712 S.W.2d 100, 105 (Tenn. 1986).

The combined testimony of Drs. Kostuik and Natelson is sufficient to enable the Whites' claims against Drs. Spengler and Wyrsch to survive a directed verdict motion. Dr. Kostuik is a recognized authority on cauda equina syndrome and is also one of the few experts who has conducted research regarding the effect of the timing of decompressive surgery on a patient's outcome. He testified that Dr. Wyrsch violated the applicable standard of care when he did not examine Ms. White after Ms. Baun described her new symptoms to him. He also testified that ordering a confirmatory myelogram was not necessarily indicated and that Dr. Spengler's decision to do so delayed Ms. White's corrective surgery.

Dr. Natelson testified that Dr. Wyrsch violated the applicable standard of care by failing to inquire about Ms. White's neurovascular status when Ms. Baun informed Dr. Wyrsch of her complaints about pain. He also testified that Dr. Wyrsch's oversight caused Ms. White to suffer damages that she would not otherwise have suffered. In addition, Dr. Natelson testified that Dr. Spengler fell below the applicable standard of care by contributing to the delay in Ms. White's treatment and caused her to suffer damages because of his actions.

Construing the testimony of Drs. Kostuik and Natelson in a light most favorable to the Whites, we cannot say that the only conclusion that a reasonable person can draw is that Drs. Spengler and Wyrsch were not negligent and that their conduct did not cause Ms. White to suffer damages that she would not otherwise have suffered. Accordingly, we reverse the directed verdicts in favor of Drs. Spengler and Wyrsch.

# V.

## THE ADEQUACY OF THE PROOF OF CAUSATION

The defendant physicians and Vanderbilt University Medical Center argue that the Whites should not be entitled to a new trial because they failed to prove that any of their acts or omissions were a cause-in-fact of Ms. White's injuries. Specifically, they assert that the Whites failed to prove with expert testimony exactly which injuries were caused by their delay in performing the decompressive surgery rather than by the causa equina itself.

A plaintiff in a medical malpractice action must prove that he or she suffered injuries that would not otherwise have occurred as a result of the defendant's negligent act or

omission. *See* Tenn. Code Ann. § 29-26-115(a)(3) (1980). A plaintiff must show that the negligent act or omission "more likely than not was the cause in fact of the harm." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn. 1993). Causation in fact is a matter of probability and not possibility, and must be shown to a reasonable degree of medical certainty. *See Volz v. Ledes*, 895 S.W.2d 677, 679 (Tenn. 1995); *White v. Methodist Hosp. S.*, 844 S.W.2d 642, 648-49 (Tenn. Ct. App. 1992). Once cause-in-fact is proven, the focus shifts to proximate cause -- whether the law, as a matter of policy, will hold the defendant responsible for the negligent conduct and its consequences. *See Kilpatrick v. Bryant*, 868 S.W.2d at 598.

Dr. Natelson, the Whites' medical expert, testified that it is more likely than not that the defendants' negligence caused Ms. White to suffer injuries that she would not have otherwise suffered. He also stated that the defendants could have diagnosed and evacuated the hematoma before Ms. White developed cauda equina syndrome and that "[i]t's more likely than not that the sooner that the blood clot was removed, the better off the patient would end up." This testimony is sufficient evidence of causation to overcome a directed verdict. Dr. Natelson testified to a reasonable degree of medical certainty that Ms. White suffered damages because of the defendants' negligence. The law does not require the level of specificity and certainty that the defendants advocate, but instead dictates that the plaintiff produce evidence showing that it is more likely than not that the defendant's negligence caused his or her injuries.

## VI.

We reverse the directed verdicts for Drs. Spengler and Wyrsch and the judgment for Dr. Jones and Vanderbilt University Medical Center and remand the case to the trial court for a new trial consistent with this opinion. We also tax the costs of this appeal, jointly and severally to Vanderbilt University Medical Center, Dan M. Spengler, Clement K. Jones, and Robert Bradley Wyrsch, for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE


CONCUR:


_____
BEN H. CANTRELL, JUDGE


_____

-19-

WALTER W. BUSSART, JUDGE

WALTER W. BUSSART, JUDGE