# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### October 15, 2010 Session

## MARKINA WESTMORELAND ET AL. v. WILLIAM L. BACON, M.D. ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 05C-3729      Joe Binkley, Judge**

---

**No. M2009-02643-COA-R3-CV - Filed January 31, 2011**

---

RICHARD H. DINKINS, J., dissenting.

I respectfully dissent from the holding that Dr. Sobel was not competent to opine as to whether one or more of the defendants deviated from the standard of care.

In granting summary judgment to defendants, the trial court held that "Plaintiffs failed to make an adequate showing that Dr. Sobel is familiar with the recognized standard of acceptable professional practice applicable to the defendants" and that, consequently, "the Affidavit of Dr. Sobel does not comply with the requirements of Tenn. Code Ann. § 29-26-115(a) and (b)." I believe that the trial court's holding that Dr. Sobel was not competent to testify is not supported by the record and that the resulting exclusion of his affidavits constitutes an abuse of the court's discretion.

I agree with the majority that the dispositive issue is whether Dr. Sobel's training and experience, as reflected in the affidavits, made his opinions relevant to the issues in the case and, thereby, made him competent to testify as an expert. The standard for admissibility of expert testimony set forth in Tenn. Code Ann. § 29-26-115 is that the expert "demonstrate[] 'sufficient familiarity with the standard of care' of the defendant's profession or specialty and [be] able to give relevant testimony on the issue in question." *McDaniel v. Rustom*, W2008-00674-COA-R3-CV, 2009 WL 1211335 at *7 (Tenn. Ct. App. May 5, 2009) (citing *Cardwell v. Bechtol*, 724 S.W.2d 739, 751 (Tenn. 1987)). In our resolution of this appeal, we apply the standard of review applicable to summary judgments, i.e., *de novo* with no presumption of correctness and reviewing the evidence in the light most favorable to the non-moving party. *McDaniel*, 2009 WL 1211335 at *6 (citing *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008)). Our standard of review is no less in light of the fact that we are reviewing a discretionary decision of the trial court, i.e., the exclusion of evidence.

The complaint in this case seeks to recover for the death of Ms. Dennis as a result of a severe pulmonary and gastrointestinal hemorrhage several days following hip replacement

surgery. Between the time of her surgery and her death, Ms. Dennis was administered medications under the supervision of the defendants to address other medical conditions which put her at a high risk of internal bleeding. The complaint details the course of Ms. Dennis' treatment in the hospital as well as her vital statistics and attaches as exhibits laboratory test results, the report on her operation, and notes from the hematology consultation. Thus, I believe that the standard of care applicable in this case is one which relates to the administration and management of the particular medication Ms. Dennis was administered and the monitoring of a person who has received such medication under the circumstances presented.

In support of their motions for summary judgment, each defendant submitted an affidavit setting out the defendant's education, training and experience; detailing the treatment the defendant had rendered Ms. Dennis; stating that the treatment complied with the standard of care[1]; and asserting that nothing that physician did caused or contributed to any injury to Ms. Dennis or her death. This was sufficient to negate plaintiffs' negligence allegations and shift the burden to plaintiffs to demonstrate the existence of a genuine issue of material fact. *McDaniel v. Rustom*, W2008-00674-COA-R3-CV, 2009 WL 1211335 at *6 (Tenn. Ct. App. May 5, 2009) (citing *Kenyon v. Handel*, 122 S.W.3d 743, 754 (Tenn. Ct. App. 2003)).

In response to the motions and affidavits, plaintiffs filed two affidavits of Dr. Sobel in which he opined relative to the treatment afforded Ms. Dennis, specifically the appropriateness and management of the medication that was administered to her. With respect to his competence and familiarity with the standard of care, Dr. Sobel's first affidavit states the following:

> 3. Through education, training, experience, years of retrospective expert and peer review and familiarity with community standards, I know of the standard(s) of care to be provided by physicians in a community similar to Nashville, Tennessee in treating patients with conditions similar to those experienced by Doris Dennis as set forth in the medical records which I have received.
> * * *

---

[1] Dr. Ikpeazu stated that his treatment of Ms. Dennis "complied with the recognized standard of acceptable professional practice required of a board-certified oncologist/hematologist in the Nashville, Tennessee community and similar communities in the treatment of similar patients in similar circumstances." Dr. Bacon stated that "all of the medical care I provided to Ms. Dennis complied with the professional standard of care applicable to me." Dr. Chinratanalab stated: "It is my opinion that I complied with the recognized standard of care for the acceptable professional practice of hematology/oncology in this community during my evaluation and treatment of Doris Dennis in December of 2004 and at all other relevant times."

6. Based on information available to me, it is my opinion that NGH is similar to hospitals where I personally practice. It is also my opinion that the Greater Atlanta and Greater Nashville metropolitan areas are similar communities.

His supplemental affidavit goes into more detail relative to his qualifications and familiarity with the standard of care in Nashville:

3. . . . I have participated as a Regional Medical Director for a Tennessee Contract Management Corporation at an administrative meeting concentrating of medical standards in Nashville. . . . I have cared for patients that have received medical care in Nashville. I have personal knowledge of medical standards in Nashville, Tn.
* * *
7. I have served as a Regional Medical Director for Team Health, a national emergency department contract management company headquartered in Knoxville, Tennessee. This company has been involved in the staffing and administration of emergency physicians throughout Tennessee and specifically in the Nashville area. The role of Regional Medical Director required significant interaction with physicians practicing in the State of Tennessee and specifically in Nashville. A Regional Medical Director provides input in establishment of clinical and administrative policy. These policies must be consistent with reasonable and prudent medical practice, i.e., the standards of care. . . .
8. I have in the past visited the Nashville, Davidson County, Tennessee area many times. I have had interactions with medical professionals practicing in the Nashville, Davidson County, Tennessee area during 2004. I have attended professional conferences in Nashville and elsewhere with other medical providers who practice in the Nashville, Davidson County, Tennessee area wherein discussions were held involving medical resources and standards of care. I have reviewed several charts of patients who were treated in the Nashville, Davidson County, Tennessee area in the past. I have received patients that have been previously treated in the Nashville, Davidson County, Tennessee area. I have previously reviewed medical charts of patients who were treated in Nashville, Tennessee and testified as an expert witness for several cases in Davidson County, Tennessee.
* * *
10. I am familiar with the recognized standard of medical care and the recognized standard of acceptable professional practice which existed in Atlanta, Georgia, and Nashville, Davidson County, Tennessee in 2004, and the year prior and the year after, for the overall medical care and treatment, including, but not limited to, the acceptable standard of care by physicians, as well as, but is not limited to, making determinations as to when certain medical

procedures, tests, care and prescriptions would be appropriate for the medical care and management of the individual patients and that of Doris Dennis.

11. It is my opinion that the recognized standard of medical care and the recognized standard of acceptable professional practice which existed in the metropolitan Atlanta area, Georgia, and Nashville, Davidson County, Tennessee in 2004, relating to the type and quality of care at issue in this matter would be the same as these two medical communities are similar as it relates to recognized standard of medical care and the recognized standard of acceptable professional practice for the type and quality of care at issue in this matter.

12. . . . It is also my opinion that with the expected knowledge and training of medical providers like WILLIAM L. BACON, M.D., WICHAI CHINRATANALAB, M.D., and CHUKWUEMEKA IKPEAZU, M.D., and the resources available to them, the applicable standard of care in such specialties in Nashville, Davidson County, Tennessee and Atlanta, Georgia were similar in 2004. This is specifically true with respect to the standard of care applicable to physicians prescribing Lovenox, after the procedures that were performed or omitted as it relates to Doris Dennis. This would include the continuance of Lovenox, with evidence of a dropping red blood cell count and several clear and present risk factors for continued hemorrhage, e.g., low platelets and a concomitant prescription of Bextra.

13. Based upon my education, training and experience, I am familiar with the recognized standard of acceptable professional practice for physicians prescribing Lovenox in Nashville, Tennessee, and similar communities in 2004 (and as it otherwise existed at all times relevant hereto). Specifically, I am familiar with the recognized standard of care for treatment of adults who are prescribed Lovenox with medical conditions identical or similar to those exhibited by Doris Dennis in 2004. I have then personally and currently do prescribe Lovenox routinely in my practice.

With respect to the practice of hematology, he states:

15. I began my training in internal medicine just as a hematologist would. A hematologist is first an internist who is expected to be proficient in the general care of medical problems. A hematologist could claim a higher level of expertise related to blood disorders and their treatment than a general internist. A hematologist, an internist and an emergency room physician are all expected to understand the basic physiology of the blood components. In the case of Doris Dennis, it is my opinion that the hematologist did not demonstrate the level of competency that would be expected of any general medical physician caring for such a patient. Further, I have provided instruction both in the clinical setting and in the lecture hall to internists related to the medical issues

4

and decision making relevant to this case. I do have the necessary training, clinical and peer review experience to know what the standard of care was in the case of Ms. Dennis and how it was breached by the defendant in the ways I will testify. Furthermore, I have done additional research and have publications relevant to medical matters in this case which I would expect to testify to when called. Indeed, I have provided previous testimony in Tennessee relevant to hemorrhage, hemorrhagic shock, anti-coagulation with Lovenox and other medical standards related to illnesses or conditions occurring during the hospitalization of Ms. Dennis. In Tennessee, I have been previously qualified as an expert in many aspects of the care of the hospitalized patient. . . .

16. . . . Treating Ms. Dennis with Lovenox required general medical knowledge of the drug prescribed, its potential adverse effects and basic physiology of blood components, such as the platelet and red blood cell. A higher level of proficiency in hematology was not required. Lovenox is prescribed by physicians of many specialties, internists, hematologists, orthopedists, cardiologists and emergency physicians, to name a few. Ironically, some breaches of the standard of care involved the area where expertise could be expected by the hematologist, for example knowledge of platelet function. Notwithstanding, the breaches which I am prepared to testify to, occurred on a more basic level.

With respect to the practice of orthopedics, he states:

21. I have had considerable training, clinical and teaching experience in orthopedics. As an emergency physician, I am called upon to evaluate, diagnose and provide the initial management and stabilization of a wide variety of orthopedic problems. Routinely, and for the last more than two decades, I have provided this initial orthopedic care as a patient's physician in the emergency department. At my discretion and as I deem appropriate, I will consult with or coordinate my care with orthopedic physicians either by telephone or in person. I routinely discuss patients with orthopedic physicians. Emergency physicians and orthopedists work collaboratively in the care of patients with orthopedic problems. I have provided instruction both in the clinical setting and in the lecture hall to orthopedic physicians in training and internists related to the medical issues and decision making relevant to this case to which I will testify concerning. I do have the necessary training, clinical and peer review experience to know what certain standards of care were in the case of Ms. Dennis and how it was breached by the defendant.
* * *

23. I have provided previous testimony in Tennessee relevant to hemorrhage, hemorrhagic shock, anti-coagulation and other medical standards related to

5

illnesses or conditions occurring during the hospitalization of Ms. Dennis. In Tennessee, I have previously been qualified as an expert in many aspects of the care of the hospitalized patient.

\* \* \*

26. I have testified in Tennessee as to the standards of care for physicians prescribing Lovenox. I have instructed physicians in many specialties including orthopedists in training regarding the effects, adverse effects and indications for use of these drugs and their classes. I have routinely prescribed Lovenox in my practice for years. I have previous[ly] submitted a research proposal to the manufacturer of Lovenox regarding the design of an aftermarket study of the drug in patients with atrial fibrillation (a heart condition). I have coordinated the care of patients receiving anti-coagulants (like Lovenox) and anti-inflammatory agents (like Bextra) with physicians of many specialties, including orthopedists. I am aware of the level of knowledge ordinarily possessed by orthopedic physicians with respect to these classes of medication, that is, anti-inflammatory agents and anti-coagulants. Any prescribing or attending physician is required to understand the use of these medications and that their combined use increases the risk of potential adverse effects, including internal and gastrointestinal bleeding.

\* \* \*

29. Internists, family practice physicians, emergency physicians, hematologists and orthopedics alike when they assume the role of a patient's attending must be able to formulate differentials diagnoses relevant to their patient's medical condition. Ms. Dennis was a patient on Lovenox, a non-steroidal anti-inflammatory medicine with low platelets and hepatitis C. She was at risk for internal and gastrointestinal bleeding. She was found to have a falling red blood, that is, acute anemia. Her physicians including the attending orthopedist allowed her Bextra to be continued. They continued her Lovenox. They did not properly appropriately monitor the patient for gastrointestinal bleeding. I have cared for many patients on these or similar medications under the same or similar circumstances. I am aware that an orthopedist is expected to understand the high risk of continuing these classes of medication under these circumstances. I have discussed similar such situations with orthopedists. I have not found their knowledge to be deficient in this regard. I believe I am qualified to testify to this based on my medical knowledge and training and experience and my routine interaction and coordination of care of patients with orthopedic physicians.

Dr. Sobel goes on to opine as to the manner in which defendants' management of Ms. Dennis "deviated from the recognized standard of care which caused injuries to Doris Dennis."

It is upon this record that the trial court determined that defendants were entitled to summary judgment. Defendants introduced no countervailing affidavit or other proof to rebut or counter Dr. Sobel's affidavits; to create an issue that his training, experience or qualifications disentitled him in any way to render such opinion or to otherwise cast doubt on the opinion; to contend that his knowledge of the standards of care as articulated in his affidavits was erroneous or deficient; or to otherwise establish a factual basis upon which the court could hold that he was not competent to testify as an expert witness. Applying the standards we are to apply when reviewing a discretionary decision of a trial court, *see White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), I would find that the trial court's holding that "Plaintiffs failed to make an adequate showing that Dr. Sobel is familiar with the recognized standard of acceptable professional practice applicable to [the defendants]" is unsupported by the evidence.

I would also find that Dr. Sobel was competent to provide expert testimony. I do not agree, as held by the majority, that Dr. Sobel was incompetent because he testified to a general standard of care, as proscribed by *Cardwell v. Bechtol*, 724 S.W.2d 739 (Tenn. Ct. App. 1987). Dr. Sobel articulated a standard of care applicable to the condition of Ms. Dennis and the treatment given to her during the course of her hospital stay—medical care which did not fall exclusively within the specialties of hematology or orthopedic surgery. Again, defendants submitted nothing to rebut the standard of care defined by Dr. Sobel or articulate one which they contended applied. Even if I agreed that Dr. Sobel must be familiar with standards of care specific to hematology and orthopedics in order to testify regarding any alleged malpractice, I believe his affidavits demonstrate familiarity with the applicable standards of care in those specialties relative to the treatment provided Ms. Dennis sufficient to provide expert testimony in this case.[2]

Moreover, there is no factual support for the reservations expressed by the majority to Dr. Sobel's training and experience and from which to conclude that he is unqualified to opine on the applicable standard of care and the deviations therefrom by the defendants. The specific concerns relative to his experience, which is perceived as limited, go to the weight to be afforded Dr. Sobel's opinions by the trier of fact rather than the admissibility of his opinions or his competence to render them. His opinions were relevant to the case and he otherwise satisfied the requirements of Tenn. Code Ann. § 29-26-115.

---

[2] As noted by the court in *McDaniel*:

> [I]n those cases where an expert has a sufficient basis upon which to establish familiarity with the defendant's field of practice, the expert's testimony may be accepted as competent proof even though he or she specializes or practices in another field."

*McDaniel v. Rushton*, 2009 WL 1211335, at *8.

7

To be entitled to summary judgement, the movant must show the absence of a genuine issue of material fact and the movant's entitlement to judgment as a matter of law. After striking Dr. Sobel's affidavits based on the finding that he was incompetent to express an opinion on the standard of care, the trial court held that plaintiffs could not comply with the burden imposed upon them by Tenn. Code Ann. § 29-26-115(a) and, as a consequence, defendants were entitled to judgment. Because I would find Dr. Sobel's affidavits to be competent evidence of the standard of care and breach thereof by the defendants, I would hold that defendants have not established their entitlement to summary judgment.

_____
RICHARD H. DINKINS, JUDGE