# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
October 3, 2003 Session
Heard at Murfreesboro[1]

# SALLY QUALLS MERCER, ET AL. v. VANDERBILT UNIVERSITY, INC., ET AL.

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Davidson County**
**No. 98C-2936      Carol Soloman, Judge**

---

**No. M2000-00801-SC-R11-CV - Filed May 3, 2004**

---

FRANK F. DROWOTA, III, C.J., dissenting.

By overruling Gray v. Ford Motor Co., 914 S.W.2d 464 (Tenn. 1996), a decision released only eight years ago, the majority disregards the principle of stare decisis and undermines the fairness goal of our prior comparative fault decisions. Therefore, I dissent from the majority's decision in this case. In addition, like the Court of Appeals, I believe the trial court erred by excluding evidence of Larry T. Qualls prior alcohol-related conduct and testimony of two defense witnesses and by commenting upon the credibility of a defense witness. Given the cumulative effect of these errors, Vanderbilt is entitled in my view to a new trial.

## I.  Comparative Fault

Twelve years ago, this Court adopted a modified system of comparative fault and rejected the contributory negligence regime. McIntyre v. Balentine, 833 S.W.2d 52, 56 (Tenn. 1992). The goal of McIntyre and all of this Court's subsequent comparative fault decisions has been achieving fairness by linking liability to fault. McIntyre, 833 S.W.2d at 56; Carroll v. Whitney, 29 S.W.3d 14, 16-18 (Tenn. 2000) (discussing prior cases). This Court's decision in Gray was entirely consistent with that fairness goal and need not be overruled to resolve the issue in this appeal.

In Gray, the plaintiff's decedent negligently crashed her car into a utility pole while under the influence of alcohol. 914 S.W.2d at 465. At the emergency room, a physician evaluated and examined the decedent, and her condition appeared to improve. The physician left the emergency

---

[1]Oral argument was heard in this case on October 3, 2003, in Murfreesboro, Rutherford County, Tennessee, as part of the S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

room to attend to other duties. Immediately after the physician's departure, the decedent's condition became critical when her blood pressure dropped to a dangerously low level. One hour later, the physician surgically removed the decedent's ruptured spleen, but the decedent later died. The cause of death was listed as a "ruptured spleen" suffered in an automobile accident. Id. at 465-66. The plaintiff brought a wrongful death action, claiming that the decedent's death had been proximately caused by the physician's negligence in treating the decedent's injury. Id. at 465. This Court held that fault may be apportioned between a patient who acts negligently in causing his or her initial injury and a physician who acts negligently in diagnosing or treating the patient for that injury. Id. at 467. However, consistent with the underlying fairness aim of our adoption of comparative fault, Gray's holding was limited to cases in which the separate, independent acts of the patient and the physician proximately cause one, indivisible injury. Id. at 465. Indeed, this Court emphasized Gray's limitation, stating: "[t]his case does not present, and the Court declines to address in this opinion, the rights and liabilities of the parties where there are multiple, separate injuries." Id.

The instant appeal presented this Court with an opportunity to answer the issue reserved in Gray – how do comparative fault principles apply in medical malpractice cases involving multiple, separate injuries? In my view, the answer to this question is not difficult. Fairness mandates that fault not be compared if the separate, independent acts of the patient and the physician result in multiple, divisible injuries. In other words, fault should not be apportioned between a patient whose negligence causes an initial injury and a physician whose negligent diagnosis or treatment causes additional, divisible injuries. Indeed, any other holding would defeat McIntyre's seminal aim of linking liability with fault. In short, whether a patient's negligence caused the need for hospitalization in the first place is not determinative if a physician's negligence causes one or more additional divisible injuries.

In this case Larry T. Qualls's negligence caused an automobile accident in which he sustained a concussion and multiple facial fractures. While Mr. Qualls's negligence caused the need for hospitalization at Vanderbilt, the record reflects that the facial fractures Mr. Qualls sustained in the accident had been properly repaired and had properly healed by the time of trial. No evidence indicates that Mr. Qualls sustained a serious brain injury in the automobile accident. Indeed, undisputed facts indicate that Mr. Qualls sustained the separate brain injury nearly four days after being admitted to Vanderbilt. The plaintiff alleged that medical malpractice on the part of Vanderbilt's employees caused this injury. What is relevant to this appeal is the fact that Mr. Qualls sustained separate, divisible injuries. Accordingly, Mr. Qualls's initial negligence resulting in the automobile accident and his need for hospitalization may not be compared with the subsequent negligence, if any, of Vanderbilt's employees. This conclusion is consistent with Gray and with the fairness aim of our prior comparative fault decisions.

In contrast, the majority's decision undercuts the fairness aim of our prior decisions. The majority decision shields from liability a plaintiff whose negligence combines with the negligence of a physician to cause an indivisible injury. Such a result is entirely inconsistent with the notion of linking liability to fault. Moreover, as my analysis illustrates, Gray poses no hurdle to resolving this case. Indeed, this appeal presents for decision the very issue expressly reserved in Gray. The

majority's determination to disregard the principle of stare decisis and overrule a recent decision therefore is both troubling and inexplicable.

Although I have concluded that Mr. Qualls's initial negligence should not be compared with the subsequent medical malpractice, if any, of Vanderbilt's employees, I agree with the Court of Appeals that Vanderbilt is entitled to a new trial because the trial court erred in excluding evidence of Mr. Qualls' prior alcohol-related conduct and the testimony of two defense witnesses and in commenting upon the credibility of a witness. As the Court of Appeals pointed out, the culmination of these errors deprived the defendant of a fair trial.

## II. Exclusion of Defense Witnesses

During pretrial discovery, the plaintiff, Mr. Qualls's conservator, served standard interrogatories on Vanderbilt seeking "the identity of each person who may have knowledge of the facts in this case." In its original response Vanderbilt did not provide the names of either Dr. John Salyer, one of Mr. Qualls's treating physicians, or James Hutchison, a biomedical engineer. Vanderbilt did not later supplement its original interrogatory response to provide their names. However, when both parties exchanged witness lists five days before trial as required by the local court rules, Vanderbilt disclosed that it intended to call both Dr. Salyer and Mr. Hutchison as witnesses.

The plaintiff moved to exclude Dr. Salyer's and Mr. Hutchison's testimony on the grounds that Vanderbilt had failed to disclose their identities in response to pretrial discovery. The trial court excluded these two witnesses as a remedial measure for Vanderbilt's failure to disclose their identities during pretrial discovery. In so doing, the trial court stated that Mr. Hutchison's proposed testimony "would be central to this case and would be a surprise to the plaintiff if it was presented now." The trial court reached the same conclusion about Dr. Salyer's testimony and compared allowing both men to testify to "trial by ambush." Ultimately the trial court excluded Dr. Salyer from testifying because he was not identified and disclosed by Vanderbilt "in a timely fashion."

Although the Tennessee Rules of Civil Procedure do not provide a sanction for abuse of the discovery process, trial courts have inherent authority to take corrective action to remedy discovery abuse. Lyle v. Exxon Corp., 746 S.W.2d 694, 699 (Tenn. 1988) (discussing expert witnesses); Strickland v. Strickland, 618 S.W.2d 496, 501 (Tenn. Ct. App. 1981) (discussing fact witnesses). In certain circumstances, excluding the testimony of a witness may be an appropriate sanction for failure to name the witness. Id. However, this Court has noted that "other sanctions may be appropriate where the failure to name . . . [the] witness is not knowing and deliberate." Lyle, 746 S.W.2d at 699. In deciding on an appropriate sanction for discovery abuse, trial courts should consider these factors: (1) the party's reasons for not providing the challenged evidence during discovery; (2) the importance of the evidence to the case; (3) the time needed for the other side to prepare to meet the evidence; and (4) the reasonableness of granting a continuance. Id. Once the trial court has determined an appropriate sanction, appellate courts review that decision under an abuse of discretion standard. Brooks v. United Uniform Co., 682 S.W.2d 913, 915 (Tenn. 1984); White v. Vanderbilt Univ., 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Under that standard

appellate courts must consider: (1) whether the factual basis for the decision is supported by the evidence; (2) whether the trial court identified and applied the applicable legal principles; and (3) whether the trial court's decision is within the range of acceptable alternatives. White, 21 S.W.3d at 223. Appellate courts ordinarily permit discretionary decisions to stand even though reasonable judicial minds can differ concerning their soundness. Overstreet v. Shoney's, Inc., 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

### A. Dr. Salyer's Testimony

While the plaintiff may have viewed Dr. Salyer as a "surprise witness," I am not convinced that Vanderbilt abused the discovery process in how it handled Dr. Salyer. Indeed, a stronger argument can be made that Dr. Salyer's late identification resulted from the plaintiff's failure to fully respond to interrogatories. Vanderbilt propounded the following interrogatory:

> Identify all health care providers, including all psychiatrists, psychologists, or therapists who have examined, treated or consulted in the care and treatment of Larry Qualls for the past ten years and state: (a) the name and address of the employer of each health care provider identified; (b) the date or dates of treatment or examination performed by each health care provider; and (c) the nature and purpose of the treatment or examination performed by each health care provider.

Even though Dr. Salyer had treated Mr. Qualls's at NHC nursing home since the summer of 1998, following Mr. Qualls's discharge from Vanderbilt, the plaintiff failed to mention Dr. Salyer or any other health care provider at NHC in her February 1999 response to this interrogatory. Nonetheless, during pre-trial discovery, the plaintiff provided Vanderbilt with Mr. Qualls's NHC medical records, and Vanderbilt learned of Dr. Salyer from reviewing these medical records, which were replete with clinical notes prepared by Dr. Salyer. Keying in on those notes, Vanderbilt interviewed Dr. Salyer and decided to call him as a witness on several issues including: (1) whether Mr. Qualls would receive better care in a nursing home or in a private home; (2) whether Mr. Qualls is currently in a persistent vegetative state; and (3) whether Mr. Qualls will benefit from some of the products and services proposed by the plaintiff's life-care plan expert, Dr. Terry Winkler. Dr. Sayler's testimony would have rebutted the testimony from witnesses for the plaintiff that criticized the care provided Mr. Qualls at the NHC facility and that opined Mr. Qualls would be better cared for in a home setting. Indeed, Dr. Salyer would have testified that Mr. Qualls remained in a persistent vegetative state, that the NHC facility provided good care, that the nursing home would be the best setting for Mr. Qualls, that Mr. Qualls requires access to a physician twenty-four hours a day, that he would not have had such access in a home setting, and that, had the family attempted to discharge him to a home setting, the discharge would have been against his medical advice. Clearly, this testimony is relevant to damages. The difference in the cost of care at NHC versus the cost of care in a home setting, as advocated by plaintiff's expert, was approximately $238,967 per year. Had the jury heard the opinions of Dr. Salyer – a witness who had not been paid by either party to this lawsuit and who had actual experience treating Mr. Qualls – it could very well have chosen a different, lower figure for part of the damages.

As the Court of Appeals pointed out, the plaintiff knew about Dr. Salyer before trial and knew that he had knowledge of Mr. Qualls treatment and care. Indeed, the plaintiff, rather than Vanderbilt, failed to disclose Dr. Sayler's identity in response to an interrogatory. Therefore, even assuming Vanderbilt violated the discovery rules with respect to Dr. Sayler's testimony, an assumption that is far from clear, I have no hesitation in concluding that the trial court erred by altogether prohibiting Dr. Salyer's testimony. There is certainly no evidence that Vanderbilt knowingly and deliberately violated the discovery rules. In the absence of proof that a litigant knowingly or deliberately withheld the identity of a witness, trial courts should rarely if ever altogether preclude the witness from testifying.

### B. Mr. Hutchison's testimony

While the situation with Mr. Hutchison is not as straightforward, I again conclude that the trial court erred in precluding his testimony. Regarding the cause of Mr. Qualls's brain injury, the plaintiff presented evidence and argued that the oxygen connected to the ventilator ran out, that the alarms on the ventilator either were not operating, were not heard, or were ignored, that the alarms on the cardiac monitor had not been appropriately set, were not operating, were not heard, or were ignored, that after the incident Vanderbilt failed to retrieve from the cardiac monitor information about Mr. Qualls's vital signs at the time of the incident, and that Mr. Qualls's brain injury resulted from one or more of these failures. To counter this theory, Vanderbilt intended to call Mr. Hutchison, who had checked all of the equipment, including the ventilator, involved in Mr. Qualls's CT scan within a few days after Mr. Qualls sustained the serious brain injury. The trial court refused to allow Mr. Hutchison to testify because Vanderbilt had not disclosed his name during pre-trial discovery.

Vanderbilt presented an offer of proof to preserve for appeal Mr. Hutchison's testimony, had he been allowed to testify. In particular, counsel for Vanderbilt stated that Mr. Hutchison would have provided the following testimony:

> First of all, on the subject of the [cardiac] monitor that is on the table here in front of us, he would testify that this particular monitor is the one used on Mr. Qualls on the evening of June 2nd 1998; that it was immediately taken to his department and it was checked out the following few days to determine whether it was in working order, and to determine whether its alarms worked and what the parameters were, that it checked out to be okay in every respect; that it operated in accordance with the manufacturers' operating manual; that the parameters on it were set within the norms they are usually set; and that there was nothing out of the ordinary about the heart rate parameters, the oximeter parameters, or any other parameters that he found.

> He would testify that it is a Hewlett Packard model. He would testify that – in regard to its ability to record and maintain a written record of an electrocardiogram strip, as it has been referred to here; that it required that a module or a cartridge, as it has been referred to in this case, be plugged into this unit before such a reading is

to be taken; that when he got this machine in his department following, there was no such cartridge or module in it. This machine does not have the capability of recording the information in its body without that module or cartridge such that can be retrieved later on a strip to keep a record of the electrocardiogram information.

They checked the alarms, the alarms were not discernible, the alarms were in working condition. The alarms worked on the suspend mode such that a red light illuminates when it is suspended, as well as a black envelope or window opens on the screen in which are the words "Alarms Off" written.

He would testify that the second method in which alarms can be disabled is to push a button and silence them; that when the silence button is utilized on this model, its silence is only for a period of three minutes. That is a period of time that is set at the factory and cannot be changed by Vanderbilt or its personnel; that the silence mode and the three-minute delay were in working order when they examined them; that when Silence is pressed, there, nevertheless, continues to be a flashing signal on the screen to the effect that the alarm is occurring.

With regard to the second piece of equipment, the ventilator, he would testify that the ventilator, before the Jury, is the one that was used on Mr. Qualls on June 2nd, 1998; that it, too, was checked by service technicians at Vanderbilt University Medical Center and that it was found to be in working order completely in accordance with the manufacturers's specifications, that the parameters on it were properly set, the alarms were properly functioning, and the machine was functioning normally.

In regard to the alarms on the ventilator, Mr. Hutchison will testify and demonstrate that there are several alarms, one of which is the disarm alarm and that the disarm alarm will come on and signal when the machine is started up if that alarm is not in the On position. It will also signal an alarm if, while the machine is running, that alarm is intentionally or inadvertently turned off.

The second alarm he would testify about is the low pressure alarm, and it is in working order and was that night on this machine, and it alarms if there's a disconnect or a low pressure signal in the device in regard to its providing oxygenation to the patient.

He would testify that there is a high pressure alarm and that pressure alarm was also in working order and it signals if there's a high pressure outside the normal parameters, and that they were properly set.

He would testify also that there is an oxygen depletion alarm on this set that was in working order and that it signals the following alarms:

That when the source gas, that is to say the oxygen, begins to get a low pressure at around 50 psi, that an alarm goes off and intermittently sounds with each respiratory breath for approximately two to four minutes before the oxygen is depleted, and that as the oxygen pressure gets lower, the alarm becomes more intense. And when the oxygen pressure is depleted, there gets to be another alarm of oxygen depleted.

That's what Mr. Hutchison would testify about if he were permitted to testify, if the Court please.

In determining whether to permit Mr. Hutchison's testimony, the first question is whether, during discovery, Vanderbilt advised the plaintiff that Mr. Hutchison had knowledge of the facts of this case. The plaintiff did not dispute that on April 26, 1999, her lawyer, her lawyer's nurse consultant, and defense counsel met Mr. Hutchison face-to-face to allow the plaintiff's lawyer to interview him about the alarm system on the CT scan monitor and ventilator. Although Mr. Hutchison did not have personal knowledge of the actual events of Mr. Qualls's June 2, 1998 CT scan, he had examined the monitors after the incident and knew how the alarms on the monitors normally function and in particular how the ventilator would have alarmed had it run out of oxygen. The plaintiff's attorney knew the scope of Mr. Hutchision's knowledge and that Mr. Hutchison proposed to testify about that knowlege at trial. The plaintiff had a free and clear opportunity while meeting with Mr. Hutchison to find out everything Mr. Hutchison knew about the cardiac monitor and the ventilator. There is no evidence that Vanderbilt in anyway concealed from the plaintiff Mr. Hutchison identity or his knowledge of relevant facts.

In excluding Mr. Hutchison's testimony, the trial court was influenced by what it called "the strange letter and agreement" between opposing counsel regarding taking discovery from Mr. Hutchison and biomedical engineers generally. During pre-trial discovery, plaintiff's counsel asked opposing counsel if he, along with his client and a nurse consultant, could meet with someone at Vanderbilt who could demonstrate how the portable cardiac monitor and portable ventilator worked. Defense counsel wrote plaintiff's counsel on April 23, 1999, just prior to the commencement of depositions, informing him that Vanderbilt would make available to him someone to answer all the questions he had about the equipment, but only if he agreed not to depose any other biomedical engineer throughout the pendency of the case. The letter stated, "If you change your mind or you do not think this adequately sets forth our understanding, please notify me immediately." There is no evidence indicating that plaintiff's counsel objected to this arrangement, and as previously stated, plaintiff's counsel subsequently interviewed Mr. Hutchison. Nonetheless, when asking the trial court to exclude Mr. Hutchison's testimony, plaintiff's counsel asserted that he would have deposed Mr. Hutchison had he known Vanderbilt intended to call Mr. Hutchison to testify at trial.

It is important to remember that Tenn. R. Civ. P. 26.02(1) allows parties to discover the identities of persons having knowledge about the facts of a case, but the rule does not require a party to designate its trial witnesses. Vanderbilt complied with its obligation to identify Mr. Hutchison, and Vanderbilt complied with Rule 29 of the Local Rules of Practice for Davidson County by

designating Mr. Hutchison a trial witness.  Notwithstanding the trial court's characterization of the lawyers' agreement as "an implied promise that the biomedical engineer would be available for information but would not be used at trial," Vanderbilt simply never informed the plaintiff that Mr. Hutchison would not testify at trial.  Thus, in my view, the trial court erred in excluding Mr. Hutchison's testimony.

Furthermore, this error was not harmless.   As Vanderbilt points out, while there was testimony that an alarm sounds on the ventilator when the oxygen supply is totally depleted, no other witness offered testimony about the two to four minute intermittent alarm attached to the ventilator which sounds when the oxygen supply is running low.  No other witness testified that the intermittent alarm sounds more and more frequently as the oxygen supply is depleted or that another alarm sounds when the oxygen is totally depleted.  Additionally, no other witness testified that the portable cardiac monitor was not capable of printing out a cardiac rhythm strip. In addition, Mr. Hutchison was the only witness who could have fully explained how the medical equipment and alarms functioned.  The jury could have weighed Mr. Hutchison's testimony against the plaintiff's theory that three people -- the attending nurse, the attending respiratory therapist, and the attending CT technologist -- failed to hear or ignored all these alarms and took no action to protect Mr. Qualls. I conclude that the trial court excluded Mr. Hutchison's testimony on erroneous grounds and that this error was not harmless because his testimony was not merely cumulative evidence.

### III. Exclusion of Mr. Qualls's Alcohol-Related Conduct
I also believe the trial court erred by excluding "all evidence of Mr. Qualls's alcohol-related conduct, including conviction for driving under the influence, aggravated assault and associated jail time." In particular, the trial judge refused to admit as irrelevant proffered testimony that Mr. Qualls drove a motor vehicle on April 13, 1996 [two years before he was injured] while intoxicated and accompanied by his children; that his blood alcohol exceeded .10 percent; that he pleaded guilty and was sentenced to jail; that in 1997 he was charged with assaulting his wife while intoxicated and resisting arrest to which he pleaded guilty.

I believe the excluded evidence of alcohol-related conduct was highly relevant to the issue of causation of Mr. Qualls's brain injury. Vanderbilt's theory was that Mr. Qualls's brain injury had not been caused by negligence but had been caused by a malignant cardiac arrhythmia, a symptom of delirium tremens Mr. Qualls had experienced as a result of his withdrawal from alcohol.  The plaintiff elicited testimony from its experts that Mr. Qualls had not been an alcoholic and had not been suffering delirium tremens. Vanderbilt sought to cross-examine these witnesses, Dr. Rodney Folz and Dr. Barry Shaw, by questioning them about their knowledge of Mr. Qualls's prior alcohol-related conduct.   Referring to this evidence prior to trial, the trial judge stated: "if [plaintiff's counsel] attempts to say that alcohol was not in the blood system of Mr. Qualls or that he did not have an alcohol problem or that – various things that he might bring up, that you would be allowed to ask again – revisit that issue in rebuttal form."  Despite the plaintiff's evidence aimed at convincing the jury that Mr. Qualls had not been an alcoholic and had not been suffering from delirium tremens, the trial judge refused to allow Vanderbilt to offer countervailing evidence of Mr. Qualls's prior alcohol-related conduct.  In doing so, the trial judge erred, and this error was not

harmless when considered in conjunction with the other errors that occurred in this trial.

### IV.  Comment on the Evidence

In my view, the trial court also erred by improperly commenting upon the evidence.  Article VI, section 9 of the Tennessee Constitution provides that, "The Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law."  Trial judges must be "very careful not to give the jury any impression as to his [or her] feelings or to make any statement which might reflect upon the weight or credibility of evidence which might sway the jury."  State v. Suttles, 767 S.W.2d 403, 407 (Tenn. 1989); State v. Eaves, 959 S.W.2d 601, 605 (Tenn. Crim. App. 1997).  While not every comment on the evidence by a judge in a jury proceeding is per se grounds for a new trial, when evaluated in conjunction with the other errors, the comments of the trial judge in this case were prejudicial.

The evidence at issue is the testimony of Ms. Fowler, the patient care partner assigned to Mr. Qualls on the evening of June 2, 1998.  Ms. Fowler had been responsible for taking Mr. Qualls to the CT suite where the brain injury from oxygen deprivation occurred.  Ms. Fowler had left the CT suite to get new linens for Mr. Qualls and returned after the scan had been completed.  The relevant questioning of Ms. Fowler and the trial court's comment were as follows:

Q.      All right.  And now tell the Jury what you saw when you came back. And I assume that you had gone to get the linens?

A.      Yes.

Q.      And can you remember how long it was that it took you to do that?

A.      I do not know.

Q.      Well, I mean, tell us what you did.  Did you just go up to the floor and grab the linen and come straight back down?

A.      Yes.

\* \* \* \* \*

Q.      When you came back down, was the scan over?

A.      I do not remember that.

Q.      Do you remember telling me in your deposition that it was?

A.      Okay.  I'm sorry.  If – what I remember was that everyone was in the scan room itself, standing around the bed when I came back.

Q.      All right.  In fact, you told me that everybody was – when you came back,

-9-

was standing around.  Isn't that what you said?

A.    They were standing around the bed.

Q.    All right.  Let me just – I'm –

A.    I'm sorry.

Q.    Let me show you, Ms. Fowler, what you said when I took your deposition back in May.  It's Page 24.  And let's see if you still remember it that way today.  Line 12.

A.    Line 12.

Q.    You see where I asked you, "Tell me what you saw when you came back; you said the scan was over?"

A.    Yes.

Q.    And your answer is what?

A.    "Everyone was standing around."
       When I said that, sir, I meant around the bed.

Q.    I know, but you remember me asking you in the beginning to tell me, answer my question to the best of your knowledge and information, remember that?

A.    (Witness moves head up and down.)

Q.    And I think I asked you two or three times if the people were standing around, and you never did tell me they were standing around the bed, you said "standing around"?
A.    I'm sorry.

Q.    Do you wish to change that in some way?

A.    What – when I said "standing around," the way the control room is set up – not the control room – excuse me – the CT room is set up, it is set up so that there is room on one – both sides of the bed to stand.  And when the patient, the person, medical personnel was there, there was someone at the head of the bed, on both sides, and one at the foot.

Q.    On this –

-10-

A.   – I'm sorry. Go ahead.

Q.   I'm sorry. I thought you were through.

* * * * *

Q.   Finish, please.

A.   What I remember from that was that the CT scan operator, Wayman, was standing at the foot of the bed which would have said both the respiratory therapist and the nurse were at the head of the bed. I didn't mean standing around such as milling around. They were standing around the bed.

Q.   When I asked you that again, because I was really under – you know, I wanted to make sure. So at Line 21, I said to you, "And you say everybody was standing around; where were they" – excuse me. Because I want to make sure when I asked you that question, "In the back where the table part was?" And you said, "Back where the CT scanner is, yes." And then I said, "Okay, they were back in where Mr. Qualls was." And you said, "Yes." And I said, "And they were standing around?" And you told me again, "Yes."

A.   They were standing around him.

Q.   Because they were waiting on you to come back with the linens –

A.   Yes.

Q.   – to change the bed, weren't they, Ms. Fowler?

A.   Yes.

Q.   That's why you went up there. Everybody knew. In fact, you had to ask Ms. Starks if it was all right for you to leave to do that?

A.   Yes.

Q.   They were all standing around waiting for you to bring the linens back to change Mr. Qualls' linen.

DEFENSE COUNSEL:   Objection to the leading, Mr. Kelly is leading and he doesn't have a right to.

-11-

THE COURT: Overruled because I'll rule this witness is a hostile witness, <u>changing her testimony from</u> – [emphasis added]

THE WITNESS: I'm sorry.

PLAINTIFF'S COUNSEL: Let me rephrase it, Your Honor.

THE COURT: All right.

PLAINTIFF'S COUNSEL:

Q. What was the reason that the people were standing around, waiting for you to come back?

A. It normally takes four people to move a patient from the bed to the scanner.

Q. So they were waiting for you to come back to help them move from table to bed?

A. Yes.

Q. Somebody knew you had gone to get linen to change the bed, is what –

A. Yes.

Q. And when you came back, that's what you thought they were waiting on?
A. Yes.

No matter the intent, the trial court's comment sounded like an appraisal of Ms. Fowler's credibility.[2] To a reasonable jury, the trial court's remark, coming when it did, could have signaled that the trial court thought the witness was trying to "change" her testimony at trial to make it more favorable to Vanderbilt than it originally had been. Given that the plaintiff was proceeding on a theory that the oxygen tank on Mr. Qualls's ventilator had run out of oxygen during the CT scan and that Vanderbilt was trying to cover up that fact, this comment was significant. Therefore, the credibility of Vanderbilt's employees was an important issue in the case. Indeed, the plaintiff's counsel argued to the jury that, "[t]his case is all about credibility," and "[t]hat's their story, [a]nd I'll ask you [the jury] to tell us when you come back whether you think that's credible or not." The

_____

[2]In a discussion with counsel outside of the jury's presence immediately after Ms. Fowler's testimony, the court told the lawyers: "I think she committed blatant perjury." While my knowledge of the proceeding is limited to the written record, I am unable to detect any hostility on Ms. Fowler's part. Nor am I able to glean from the questions and answers any significant divergence between Ms. Fowler's testimony at trial and her deposition testimony.

-12-

plaintiff implied that Vanderbilt was covering up what really happened to Mr. Qualls, saying that the alarm on the ventilator failed to sound because it had been disengaged, "[b]ut they're not going to tell you that, because that's bad . . .." The truthfulness issue was so central to the case that Vanderbilt's lawyer spent the first part of his closing argument trying to debunk any cover-up theory. He suggested to the jury that it would be an extreme notion that all the medical personnel "were lying."

When considered in the context of this case, the trial court's comment on Ms. Fowler's credibility was not harmless. Furthermore, I am unable to agree with the Court of Appeals's conclusion that Vanderbilt waived this issue by refusing the trial court's offer of a curative instruction. As Vanderbilt points out, the trial court offered to provide a "curative instruction" that actually re-emphasized the improper comment, stating:

> [M]y one comment about allowing [plaintiff's counsel] to further examine and lead the witness <u>who had changed her testimony from the deposition to the trial</u> was exactly that. I was explaining why I was allowing him to lead <u>because of the change in her testimony</u>. It was not commenting on her truthfulness. Would you like me to explain that to the Jury?

(Emphasis Added.) In this instance, the offered curative instruction clearly would have exacerbated the error. Furthermore, had the trial judge phrased the curative instruction without referring to a "change in testimony," any further statement by the trial judge would have certainly reminded the jury of the initial comment, again exacerbating the error. In the context of this case, where credibility of the eyewitnesses to the event was of paramount importance and where other errors occurred during the trial, a curative instruction would not have been sufficient. Accordingly, this error combined with the other errors outlined above to deprive Vanderbilt of a fair trial.

## V.  Conclusion

For all these reasons, I dissent from the majority's decision and would grant Vanderbilt a new trial. Because I believe a new trial is necessary on other grounds, I would reserve for another day the issue of first impression: whether an annuitist's testimony is admissible in a personal injury case in Tennessee.

_____
FRANK F. DROWOTA, III, CHIEF JUSTICE

-13-