IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 9, 2008 Session

## EDWIN O. MARTIN, ET AL. v. CARL NASH, ET AL.

**Appeal from the Chancery Court for Putnam County**
**No. 2001-282     Ronald Thurman, Chancellor**

_____

**No. M2007-02375-COA-R3-CV - Filed March 20, 2009**

_____

Members of family in whose name a cemetery was established brought suit against owners of property surrounding the cemetery seeking removal of a cloud upon their title to the cemetery, injunctive relief and damages. The trial court declared the boundaries of the original cemetery and limited those entitled to be buried therein to the family members; allowed that members of the general public were permitted to be buried in land added to the original cemetery tract; and appointed trustees to manage the cemetery as established under both conveyances. Family members appeal, contending that trial court erred in setting the cemetery boundary; in disregarding proof of cost of repairing fence which had been removed by one defendant; and in refusing to hear testimony as to the trust fund established for the maintenance of the cemetery. Finding no error, we affirm the decision of the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Frank F. Buck, Smithville, Tennessee, for the appellant, Edwin O. Martin.

Jon E. Jones, Cookeville, Tennessee, and John C. Knowles, Sparta, Tennessee, for the appellee, Carl Nash.

### OPINION

In July of 1930, A.W. Williams conveyed an area on his farm in Putnam County, determined by the trial court to be 85 feet by 155 feet, to certain trustees to be used as burial grounds for deceased members of the Martin family, to be known as the A. A. Martin Cemetery. The cemetery was enclosed in a rail fence. In the early 1940's, Carl Nash and his wife Maggie (a Martin descendant) purchased the farm on which the cemetery was located. In or around 1946, Mr. Nash erected a new woven wire fence to keep his cattle out of the cemetery; the new fence, which replaced the rail fence, which had deteriorated, surrounded the original cemetery, and added slightly more

land to the original cemetery plot. Martin descendants are buried both inside and outside the original cemetery area.

In 1995, Mr. Nash deeded one acre (210 feet by 210 feet) to Reece Nash and four other persons, as trustees, for use as burial grounds to be known as the Martin Cemetery. This acre of land enclosed all of the land that had previously been used as the Martin cemetery.[1] Anyone could be buried in Phase II, free of charge. In 2001, a member of the Nash family bulldozed the wire fence that had been in place since Mr. Nash installed it in 1946.

Plaintiffs, representatives of the Martin family, objected to the bulldozing of the fence and to the possibility of people other than Martin descendants being buried in the cemetery. The trustees agreed that only Martin descendants would be buried on a portion of the land and placed markers distinguishing this portion of land within the acre of land. These markers roughly followed the original 85 by 155 foot area of the cemetery (Phase I). Some of these markers were placed on or extremely near the graves of Martin descendants buried in Phase II.

Plaintiffs brought suit against the trustees appointed by Mr. Nash in the 1995 deed, who have maintained the cemetery in the years since the conveyance, seeking removal of a cloud upon title to establish that the original A.A. Martin cemetery had been created solely for the purpose of burying Martin descendants. Plaintiffs contended that the wire fence established an enlargement of the original cemetery and requested that the entire area previously enclosed by the wire fence be maintained by Martin descendants as a cemetery limited to relatives of the Martin family. Plaintiffs also sought damages for repair of the bulldozed fence and dissolution of the current board of trustees.

The trial court determined that the area of Phase I had not been enlarged by the erection of the fence in 1946 and declared the dimensions of Phase I to be 85 feet by 155 feet. The court decreed that only Martin descendants could be buried in this area and that anyone could be buried in Phase II. The court refused to permit testimony regarding the cost of replacing the wire fence which had been demolished, holding that, since Mr. Nash had erected the fence, he had a right to tear it down and that, because the fence was in such battered condition at the time it was bulldozed, it was worthless. The trial court decided that the entire cemetery property should be governed by one body, approving the election of the existing trustees and adding a member from the plaintiff's side of the Martin family to their number.

Plaintiffs appeal the judgment, asserting that the trial court erred in setting the cemetery boundary; failing to hear proof of the cost of repairing the fence removed by one defendant; in refusing to hear testimony as to the trust fund established for the maintenance of the cemetery; and in not approving separate trustees for Phase I.

---

[1] The trial court designated the original cemetery area as Phase I and the area added in the 1995 conveyance as Phase II; for ease of reference, we shall do likewise.

## I. Discussion

This case was tried without a jury, with the Chancellor making oral findings of fact and conclusions of law which were incorporated into the Judgment. Our review of the trial court's findings of fact is *de novo*, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d). Our review of the trial court's determinations regarding questions of law is *de novo* with no presumption of correctness. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); Tenn. R. App. P. 13(d).

### A. Boundary of the Cemetery

The trial court found that the July 1930 deed of A. W. Williams set up a 85 feet by 155 feet plot of land as a cemetery for the family and the offspring of A. A. Martin;[2] that a rail fence had been constructed around the plot of land constituting the cemetery;[3] that the conveyance was to certain named trustees, but the deed did not provide for the trustees' dying or becoming disabled; that Carl Nash acquired the farm on which the cemetery was located in the 1940's; and that in 1995 Mr. Nash conveyed additional land to trustees for expansion of the cemetery, for a total of 210 feet by 210 feet.

Plaintiffs contend that the trial court erred in declaring the boundary of the original cemetery, asserting that it was expanded by the erection of the wire fence in 1946. Plaintiffs also argue that, even if the fence does not constitute an expansion, Martin family members were buried outside the original Phase I area, thereby establishing the larger Phase II area as "dedicated" cemetery grounds, which the Plaintiffs are entitled to protect.

There was no competent proof at trial or in the record to support the contention that Phase I (and the limitation of persons who could be buried therein) was expanded by the erection of the wire fence or by Carl Nash's 1995 conveyance. Mr. Nash, who died prior to trial, testified by deposition as follows:

> Q. How did you decide where to put the fence to keep your stock out?
> A. Well, I just got back far enough from the cemetery that I thought they had plenty of room there. I wasn't particular about it where the fence went. I got away from the graves, back quite a distance back and beyond where this old fence was.
> * * *
> Q. Okay. How did you decide how large to make your deed?
> A. Well, I thought that would be sufficient for years to come. My wife and I thought an acre of ground would be sufficient for the family cemetery out there. It was mostly Martin related that was buried there.

---

[2] The court found, based on the parties' stipulation, that "offspring" was not limited to blood relatives or descendants of A. A. Martin, but included spouses and children.

[3] The court noted that the dimensions set off by the fence were "a little bit wider, and a little bit shorter than what the deed called for."

\* \* \*

Q. All right. And you haven't made a Deed of Correction to correct it, so you have left it on the books, including the old Martin Cemetery.

A. That is right. It surrounds the whole thing. Where I come back here and set up my corner and surrounded it over at the other place, why, I just added onto it on both sides of it, the back side of it and both sides too of that old Martin deed.

Mr. Nash testified that, when he bought the farm, there were about eight persons buried in Phase I, that, at the time of his testimony,[4] there were forty-eight graves at the cemetery, including those of persons other than blood relatives or descendants of A. A. Martin. He also testified as to efforts he made to maintain and preserve the cemetery, including erecting the wire fence to keep his cattle out of the area and building a road around the cemetery. With respect to Mr. Nash's intention as to who could be buried in Phase II he testified:

Q. All right. After you had an opportunity to read the old deed, and you know what you did, do you not agree now that you have attempted in your deed to change the character of the cemetery as to who could be buried there?

A. Not one bit.

Q. Not one bit. Well, tell me how does that work?

A. Anybody can be buried there that wants to be. That is what I wrote in my deed. I put it in my deed that way.

Q. Do you think that you have a right to change the . . .

A. I had nothing to do with that deed [the 1930 deed]. No, I didn't have a right to change that deed or destroy it up or nothing else. That deed. . . To me, that deed is valid.

Q. Do you admit then that as far as this cemetery and what was dedicated to the cemetery that it is referring to in 1930, that you have to obey the provisions of that deed relative to who can be buried there?

\* \* \*

A. I didn't want to do anything. . . I didn't want to interfere with that deed none whatever. What deed that I made to that, my deed didn't cover that. They had the deed that covered that. My deed didn't cover that part of that. The rest of the acre of ground there is what will be used as my deed. The Martin Cemetery can have it. I would be willing for the Martin Cemetery to go down there and badger off that 165 feet by 65 feet and stake it out and let it sit out there by itself if they wanted to.

\* \* \*

A. The deed that I made, I made it for the purpose of Martin or for anybody that was a relative to the Martins, or anybody else. The deed that I made, why, I could be buried out there if I wanted to be, and I am not no descendant of Martin.

---

[4] Mr. Nash's deposition was taken in August 2002.

Mr. Nash's testimony was supported by the testimony of his son, Armond Nash, who testified at length about his father's initial purchase of the farm in 1941 and the manner in which the cemetery had been maintained over the years.

The preponderance of the evidence shows two separate conveyances of land for purposes of establishing the cemetery, one in 1930 and one in 1995. The proof is also clear from the 1995 deed, as well as the testimony of Mr. Nash, that there was no limitation of those who could be buried in Phase II to the descendants of A. A. Martin. The entire evidence shows Mr. Nash's intention, after he acquired the property, to respect the establishment of the cemetery in 1930, to preserve and maintain it, and to expand it to allow for increasing numbers of Martin family members and others who were buried around the original cemetery. The trial court's findings in this regard and its declaration of the boundaries of Phase I and Phase II are fully supported by the evidence.

B. Testimony Regarding the Cost of the Fence

Plaintiffs argue that testimonial proof regarding the cost of the fence should have been permitted, due to the fact that they owned and maintained the central portion of the fence, whereby vehicles entered and exited the cemetery. They sought to introduce testimony of an estimate for the replacement of the fence in support of their claim for damages[5] through the testimony of Edwin Martin, great-grandson of A. A. Martin. The testimony was objected to on the ground that it constituted hearsay and, since there was no proof that Mr. Martin was the owner of the fence or the property on which the fence was located, the proffered testimony was an inadmissible opinion. The court correctly sustained the objection.

The testimony as to the amount of the estimate that Mr. Martin had received to replace the fence was clearly hearsay and did not come within an exception to the hearsay rule. *See* Article VIII, Tenn. R. Evid. Further, the court correctly ruled that Mr. Martin had a right to express his opinion as to the value of the fence only if he was the owner of the property; this is in accordance with Rule 701(b), Tenn. R. Evid.

In holding that the Plaintiffs were not entitled to damages for the removal of the fence, the court ruled that "[t]hat was Mr. Nash's fence to replace, not the cemetery's." This holding is supported by the evidence. Mr. Carl Nash testified:

Q. During the year 2001, did not Mr. Armon[d] Nash or Reece Nash or some of your family go in there with a bulldozer and have the fence bulldozed out along with the trees?

_____

[5] Plaintiffs' brief on appeal quotes Tenn. Code Ann. § 46-1-213(b)(2) without explanation, apparently to support their claim for damages. This statute, however, would not support an award of damages in this case, since the statute requires a person to be convicted of the offense proscribed in § 46-1-213(a); the damages are awarded as restitution "to the cemetery and/or the other aggrieved parties" and are in addition to the sanctions imposed for the Class E felony conviction.

A.  Yes.  That had nothing to do with the Martin Cemetery.  That fence had nothing to do with the Martin Cemetery.  That fence was on my land altogether.
Q.  And that fence had been up there since about the mid 1940's or right after World War II, hadn't it?
A.  Yes.  It has been there ever since '46, or close to '46.

This testimony of Carl Nash was supported by the following testimony of his son, Armond:

Q.  All right.  So the original – the fence that your father put up after World War II --
A.  '45, '46, something along there.
Q.  Okay.  He put that up to keep his cattle out of the cemetery area?
A.  Correct.
Q.  Okay.  Did he put that in at his expense?
A.  Correct.

By contrast, the only testimony offered by Plaintiffs relative to the ownership of the fence was that of Edwin Martin, great-grandson of A. A. Martin, who testified that Carl Nash and Collie Martin (Edwin Martin's father) had an agreement that, if the Martin family would buy the wire fence, Mr. Nash and his son would put it in, but that he was not present when the fence was bought or delivered to the cemetery.  He further testified that he only knew that buying the fence had been discussed between his father and his father's sisters; he did not know whether his father bought the fence.

C.  Composition of the Board of Trustees

The 1930 deed establishing the original cemetery named N. O. Myatt, J. R. Stover and Fate Patton as trustees; however, the deed made no provision for the appointment of successor or substitute trustees.  The trustees named in the 1930 deed were not replaced when they died and, over the years prior to the 1995 Carl Nash deed of Phase II, the record shows that the cemetery property was maintained by various members of the Martin and Nash families.  The 1995 deed named Reece Nash, Omage Martin, L. D. Anderson, Gerald Myatt and Robert Elrod, as trustees, vesting "control of the cemetery . . . in the hands of the Trustees who have the authority to select a successor to fill any vacancy that may occur."  In May of 2001, the trustees under the 1995 deed sent a letter to all known descendants of A. A. Martin, enclosing a ballot for the election of three persons "as trustees of the 1930 deed."  L. D. Anderson, Carl Nash and Reece Nash were selected through this process and were appointed to fill the vacancies of Mr. N. O. Myatt, Mr. Stover and Mr. Patton.  In 2007 a second election was held to replace deceased trustees Robert Elrod and Omage Martin, trustees under the 1995 deed, and Carl Nash; in this election Armond Nash, Carl Reese Nash and Burly Cannon, all A. A. Martin descendants, were elected.

After determining the boundaries of the original cemetery and the addition under the Carl Nash conveyance, the trial court named trustees to manage the cemetery, as follows:

Because it is essential that the entire cemetery property be managed as a single enterprise and the Court having found that the present trustees of the cemetery trust established by Carl Nash have exercised prudence and good judgment in their management of the cemetery, the Court ORDERS that the following individuals will act as trustees of the Martin cemetery under both the 1930 A. Williams deed and the 1995 Carl Nash deed: Gerald Myatt, L. D. Anderson, Reece Nash, Armon[d] Nash, Carl Reece Nash, Burley Cannon and Angie Radnadi. This board of trustees will be self-perpetuating with successor trustees elected by the board.

Plaintiffs complain that the election of trustees was a "mock election" and that some members of the Martin family did not have an opportunity to vote while ballots were sent to persons that had no blood relationship to the A. A. Martin family. In their complaint, Plaintiffs requested that the election of the 1930 trustees be set aside and a new election held. On appeal, Plaintiffs contend that the trial court erred in refusing to hear testimony about their own established charitable charter and trust, which would have shown that they assumed care for the entire 122 by 155 foot expanded area (the wire fence area), thereby supporting the necessity of having two different governing bodies. They also assert that the trial court's addition of one of their family members to the board still leaves them outnumbered and that their interests are insufficiently supported by the board of trustees.

In ruling on these issues, the trial court held:

And the Martins and Nashes and everyone in here, their families, have been keeping this up for years and years without any direction, until Mr. Nash came along and deeded this extra land and set up a board of trustees. It wasn't perfect. . . . This wasn't a perfect election. Not everybody was notified. Could they have notified everybody? Probably not, unless they wanted to spend a pile of money. . . . The Court finds that the actions taken to elect this board are valid, and as far as this Court is concerned, acted appropriately with the election of the board of directors, board of trustees, to serve over this Phase II, the governing board of this entire cemetery. I think this board, as presently constituted, is appropriate. . . . The Court is going to however add an additional member. . . . I want someone in the Martin family that's younger to serve on this board. I think the way its set up, that since this family - - that since you-all to some degree have Martin blood . . . I think that's a reasonable resolution to try and take care of this cemetery.

While Plaintiffs take issue with the court's ruling regarding the composition of the board, they fail to cite any authority that the court exceeded its authority[6] or committed error. We have

---

[6] In making its ruling as to the composition of the board of trustees, the trial court cited its authority under Tenn. Code Ann. § 35-15-201(a), which provides:

The court may intervene in the administration of a trust to the extent its jurisdiction is invoked by an

(continued...)

reviewed the record and determined that the appointment of a single board, composed of those persons who were contemplated in the 1930 deed (the family and offspring of A. A. Martin) and those trustees named in the 1995 deed was, as the court stated, a reasonable and appropriate resolution of the controversy and not contrary to the intent of either A. W. Williams or Carl Nash in their respective grants of land for the cemetery and naming of trustees.

### D. Evidence regarding the Charitable Charter and Trust Fund

Testimony was offered by Plaintiffs regarding their securing a charitable charter and establishing a trust fund for the cemetery, which was objected to on the grounds of relevance. In the colloquy prior to the court's ruling on the objection, counsel for Plaintiffs advised that the fund had been set up after the filing of the suit "to formalize or provide some kind of legal matter to keep the trust fund, you know, to keep the cemetery." The trial court sustained the objection.[7] We fail to see any error of the trial court in excluding this evidence.

We review the trial court's evidentiary decisions utilizing an abuse of discretion standard. *White v. Vanderbilt Univ.,* 21 S.W.3d 215, 222 (Tenn. Ct. App. 1999); *see also Seffernick v. Saint Thomas Hosp.,* 969 S.W.2d 391, 393 (Tenn. 1998); *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 442 (Tenn. 1992). The decision is reviewed to determine: (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives. *See BIF v. Service Constr. Co.,* 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988). Appellate courts will set aside a discretionary decision only when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence. *See Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

The primary issues before the trial court involved the boundaries of the cemetery established in the 1930 deed; whether those boundaries were expanded by the construction of the wire fence; the boundaries of the cemetery addition established in the 1995 deed; and the election and composition of the trustees to manage the cemetery. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Plaintiffs have failed to show how proof regarding the establishment of a charitable charter and trust by Plaintiffs after the suit was filed was relevant to the issues presented or, to the extent it may have had some relevance, the trial court abused its discretion in sustaining the objection.

---

[6] (...continued)
interested person or as provided by law.

[7] Plaintiffs did not make an offer of proof in this regard.

## II.  Conclusion

For the reasons set forth above, we affirm the judgment of the trial court in all respects. Costs are assessed to Appellants, for which execution may issue, if necessary.

_____

RICHARD H. DINKINS, JUDGE