IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 22, 2020 Session

## MICHAEL SURBER v. MOUNTAIN STATES HEALTH ALLIANCE d/b/a JOHNSON CITY MEDICAL CENTER

Appeal from the Circuit Court for Washington County
No. 33593     J. Eddie Lauderback, Judge

_____

### No. E2019-01494-COA-R3-CV
_____

This is a medical malpractice action[1] in which the plaintiff filed suit against the hospital for treatment he received following an eye injury, raising claims of direct and vicarious liability.  The case proceeded to a jury trial, at which the court granted a directed verdict on the claim of direct liability at the close of the plaintiff's proof.  The plaintiff filed this appeal, claiming the trial court erred in limiting his expert witness testimony.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which THOMAS R. FRIERSON, II, J., joined.  D. MICHAEL SWINEY, C.J., filed a separate concurring opinion.

Mark T. Hurt, Abingdon, Virginia, for the appellant, Michael Surber.

Frank H. Anderson, Johnson City, Tennessee, and Jimmie C. Miller and Sydney B. Gilbert, Kingsport, Tennessee, for the appellee, Mountain States Health Alliance d/b/a Johnson City Medical Center.

---

[1] Tennessee Code Annotated section 29-26-101 now defines most cases occurring in a medical context as "health care liability actions."  Such an action "means any civil action . . . alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, regardless of the theory of liability, on which the action is based. . . ."  Acts 2011, ch. 510, § 8.  Effective April 23, 2012, the term "health care liability" replaced "medical malpractice" in the Code.  Acts 2012, ch. 798.  The provisions of the revised statute do not apply to this action.

# OPINION

## I. BACKGROUND

On November 4, 2006, Michael Surber ("Plaintiff") was working on a motorcycle while his father was welding in the same room. Although Plaintiff was wearing safety glasses, he developed severe eye pain. He promptly visited Mountain States Health Alliance d/b/a Johnson City Medical Center ("the Hospital"). Plaintiff relayed his symptoms to the triage nurse, complaining of a possible foreign object in his eye, and the nurse sent him to the "Fast Track" area of the Hospital.

Plaintiff was seen by a physician's assistant ("PA"), who, after reviewing his symptoms and performing a variety of tests, diagnosed him with a corneal abrasion and UV conjunctivitis, believing that he had a welder's burn and a scratch on his eye. Plaintiff was never examined by the supervising medical doctor and was ultimately discharged, with pain medication and instruction to wear an eye patch for 24 hours. He was further advised to return if his symptoms persisted when he removed the eye patch upon the expiration of 24 hours.

Plaintiff experienced pain when he removed the eye patch the next day, November 5. However, he did not return to the Hospital as instructed and did not seek any further treatment until November 8, when he went to Northside Hospital. There, he was examined by an emergency room physician. When his pain did not subside, Plaintiff visited the Johnson City Eye Clinic. He was seen by Dr. Carlson, who ordered an ultrasound of the eye. At that time, it was discovered that Plaintiff had a foreign object in his eye. Dr. Carlson referred him to Dr. Gunn, a retina specialist, at Indian Path Medical Center for further treatment. Dr. Gunn diagnosed him with a severe infection of the eye, typically caused by a traumatic injury due to a foreign body. Plaintiff received an injection of an anti-inflammatory agent in his eye and antibiotics for the infection.

Plaintiff was then seen by another specialist on November 9, and he even received surgery on November 13. However, the physician was unable to remove the foreign object during surgery. As his vision worsened, he received treatment from a number of physicians and also received a CT scan on November 26, which further revealed the foreign body, measuring 7.9 millimeters in length and 1.7 millimeters in thickness. Plaintiff finally underwent a second surgery that resulted in the loss of his eyeball on November 29. He now wears a prosthetic eyeball.

Plaintiff initially filed suit on October 30, 2007, against the Hospital and Nathaniel J. Lee, M.D., the physician on staff at the Hospital on November 4, 2006. Dr. Lee was later dismissed as a party, and Plaintiff moved for a voluntary dismissal shortly

thereafter. The court granted the motion and entered a dismissal without prejudice on September 9, 2013.

Plaintiff then filed this action on September 9, 2014, naming the Hospital as the sole defendant. His claims against the Hospital were based upon theories of vicarious liability, for the alleged negligence of the PA, and of direct liability, for the Hospital's failure to enforce its own policy that every ER patient must be seen by a physician. As to the direct liability claim, which is the claim at issue in this appeal, Plaintiff obtained the expert testimony of Alan Markowitz, Ph.D. to address the standard of care and breach of those elements. Plaintiff also arranged the expert testimony of John Thomas Edmonds, M.D., an ophthalmologist, to address the causation element of the claim.

Before the case proceeded to trial, the Hospital filed multiple motions *in limine* to limit Dr. Markowitz's testimony. Following oral arguments on the contested motions in a pretrial conference, the court decided, in relevant part, that Dr. Markowitz was prohibited from equating an internal hospital policy to the appropriate standard of care and from testifying to the standard of care relative to a physician, PA, or nurse. The court offered the following guidance in support of its ruling:

> The Court finds that a hospital administrator, such as [Dr. Markowitz], is permitted to testify as to the standard of care applicable to a hospital; however, at trial, [Dr. Markowitz] will be required to lay a proper foundation relative to the formation of his opinions. At trial, [Dr. Markowitz] is prohibited from testifying that an internal hospital policy, protocol, procedure, medical staff rule, regulation and/or medical staff bylaw equates to the standard of care. Similarly, [Dr. Markowitz] is prohibited from testifying that a federal or state rule, regulation or law equates to the standard of care. Prior to [Dr. Markowitz] testifying at trial, counsel for the parties will be permitted to voir dire him outside the presence of the jury for purposes of the Court determining whether [Dr. Markowitz] is qualified to testify to the standard of care applicable to [the Hospital]. Accordingly, the Court's rulings on the Motions in Limine are granted in part, and reserved in part pending voir dire of [Dr. Markowitz] at trial as to whether he is qualified to testify as to the standard of care applicable to [the Hospital].

When the case proceeded to trial, Dr. Markowitz was called by Plaintiff and recognized as an expert in the field of hospital administration and the standard of care relating to that field. However, when Dr. Markowitz began to testify about the Hospital's Rules and Regulations requiring every ER patient to be seen by a physician, the Hospital objected. The Hospital's counsel requested that the matter be addressed outside the presence of the

jury, and the trial court ruled that Dr. Markowitz's testimony violated the pretrial order. Specifically, the court reiterated that Dr. Markowitz was prohibited from testifying that a hospital's internal policies equated to the standard of care. After Dr. Markowitz provided an offer of proof for the record, the trial court ruled the testimony inadmissible and instructed the jury to disregard his testimony in its entirety.

At the conclusion of Plaintiff's proof, the Hospital moved for a directed verdict on the direct liability claim. Plaintiff conceded that he was unable to prove his claim of direct liability without Dr. Markowitz's testimony. The court granted the motion and dismissed the claim.[2] This timely appeal followed the denial of post-trial motions.

## II.    ISSUES

Plaintiff offers the following issues for this court's review:

A.    Did the circuit court err in excluding the opinions of the hospital administration expert on the defendant Hospital's standard of care and breach of that standard?

B.    Did the circuit court err in excluding the opinion of the hospital administration expert on the standard of care because of his testimony that the standard of care was commensurate with the Hospital's internal policy that every ER patient must be seen by a physician?

C.    When the Supreme Court has held that "[a] hospital can be negligent for failing to enforce its policies and procedures in patient care," [*Barkes v. River Park Hosp., Inc.*, 328 S.W.3d. 829, 835 (Tenn. 2010),] was it error for the circuit court to exclude the opinion of the hospital administration expert that the defendant Hospital breached its standard of care because he opined that the breach was the Hospital not following and enforcing its internal policy that every ER patient must be seen by a physician?

D.    When the Supreme Court has observed that a direct liability claim against a hospital asserts negligence that is "in essence, managerial and administrative in nature," *Barkes*, 328 S.W.3d at 835, did the circuit court err in excluding the opinion of the hospital administration expert as to the defendant Hospital's standard of care, and whether the Hospital breached

---

[2] The case proceeded on the claim of vicarious liability. The case was submitted to the jury, which found that the PA was not at fault, thereby requiring a verdict in favor of the Hospital.

its standard of care on the ground that the expert was not competent because he was not a medical doctor?

E.	Did the circuit court err in issuing an order granting defendant Hospital's motion in limine excluding any testimony of the hospital administration expert equating an internal policy of the Hospital with the applicable standard of care?

While stated variously by Plaintiff, we consolidate and restate the sole and determinative issue on appeal as whether the trial court abused its discretion in limiting Dr. Markowitz's expert testimony.

## III.	STANDARD OF REVIEW

Rulings on admissibility of evidence are within a trial court's discretion. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999). "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard or reache[s] a decision which is against logic or reasoning that cause [s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). We review the decision of the trial court to determine:

(1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principle, and (3) whether the trial court's decision is within the range of acceptable alternatives.

*White*, 21 S.W.3d at 223. Improper admission or exclusion of evidence requires a new trial if the outcome of the trial was affected. Tenn. R. App. P. 36(b); *White*, 21 S.W.3d at 222.

## IV.	DISCUSSION

"To obtain a favorable verdict from the jury, [Plaintiff] was required to show at trial that [the Hospital] failed to exercise that degree of care, skill, and diligence used by hospitals generally in the hospital's community and that its failure was the cause in fact and a proximate cause of [Plaintiff's injury]." *Barkes v. River Park Hosp., Inc.*, 328 S.W.3d 829, 834 (Tenn. 2010) (internal citations and quotations omitted). Plaintiff relies heavily on the Supreme Court's opinion in *Barkes*, where the Court upheld a jury's verdict against a hospital for direct liability based upon the hospital's failure to follow its

own policies and procedures. *Id.* at 834. The facts of the case in *Barkes* are eerily similar to the facts presented here. In *Barkes*, the patient sought medical treatment after working outside with an ax and other hand tools to clear his yard. *Id.* at 831. He stopped working when he noticed that his left arm was hurting. *Id.* Unable to ease his pain, he and his wife visited the emergency room, where he was treated by a PA. *Id.* The PA did not deem a full cardiac workup necessary given the symptoms present. *Id.* She conferred with the physician on duty, who agreed with the diagnosis and treatment plan given the information presented. *Id.* The patient was discharged with instruction to ice his arm and take pain relievers. *Id.* He was never seen by a physician. *Id.* Less than two hours later, he collapsed at home and was found unconscious. *Id.* He returned to the hospital via ambulance, but the attempts to resuscitate him were unsuccessful. Id. His widow filed suit against the hospital based upon a theory of direct liability. *Id.* In support of her claim, she alleged as follows:

> [H]ad Mr. Barkes been triaged by a registered nurse instead of a paramedic, and had he been seen and examined by a physician instead of a nurse practitioner, the appropriate inquiries would have been made and the potential warning signs of a heart attack would have been observed. Mrs. Barkes also argued that had a physician examined her husband, the physician would have observed that Mr. Barkes had many potential risk factors for a heart attack, including being a heavy smoker, being obese with high cholesterol levels and having a family history of heart disease.

*Id.* Notably, Dr. Markowitz was an expert witness in the case.

In upholding the jury's verdict, the Court first acknowledged that "Tennessee law clearly recognizes that hospitals owe a duty of reasonable care to their patients and may be directly liable to patients independent of any liability based on the hospital's employees or agents." *Id.* at 833. The Court then found the following material evidence sufficient to support the jury's verdict:

- River Park's policy in effect at the time of Mr. Barkes' treatment stated, "Any patient arriving at the Emergency Department will be seen by the emergency department nurse; triaged; and then seen by the appropriate physician." It also stated, "All patients presenting for treatment in the emergency room are assessed by an emergency physician."

- Alan Markowitz, PhD., an expert witness regarding hospital administration, testified that the standard of care at the time of Mr. Barkes' treatment for hospitals similarly situated to River Park was for a registered

nurse to triage the patient and a physician to "lay hands" on the patient, which is commensurate with River Park's policy.

•  Nurse Practitioner Kinkade, the medical provider who treated Mr. Barkes, testified that she was not aware of River Park's policy requiring every patient presenting in the emergency department to be seen by a physician.

•  Dr. Rosa Stone, who was working in River Park's emergency department at the time of Mr. Barkes' treatment, also testified that she was not aware of River Park's policy requiring that any patient be seen by the appropriate physician.

•  Dr. Stone testified that, when being consulted by Nurse Practitioner Kinkade about Ms. Kinkade's decision to discharge Mr. Barkes, she asked Ms. Kinkade whether Mr. Barkes exhibited any signs of myocardial infarction, specifically whether he had prior cardiac history, shortness of breath, any other pain, and chest pain, to exclude cardiac related illness.

•  Dr. Stone testified that she "would have reevaluated him" had she known that Mr. Barkes had a family history of cardiac problems, had high cholesterol, was pale, was sweating, was nauseous, was overweight, and was a smoker, *all of which is information that a physician might elicit when evaluating a patient*.

•  Dr. Morton J. Kern, an expert witness, testified that the "treatment of Mr. Barkes was below the standard of care for emergency rooms looking at patients of this same presentation," and that had the appropriate standard of care been applied, "Such treatment, I believe, would have saved his life."

(Emphasis added.).

Here, Plaintiff relied solely upon Dr. Markowitz to establish the standard of care and the breach of such standard in support of his direct liability claim. Plaintiff asserts that he sought to elicit the same testimony met with approval by the Court in *Barkes*. We disagree. The plaintiff in *Barkes* offered such testimony through several witnesses, including a qualified medical expert. In *Barkes*, the Court noted as follows:

At trial, Mrs. Barkes presented the expert testimony of [(1) Dr. Markowitz], [(2)] a board-certified emergency medicine physician, and [(3)] a cardiologist, all of whom testified that the treatment of Mr. Barkes in River

Park's emergency room fell below the applicable standard of reasonable care for a hospital under the circumstances. These experts agreed that the failure of River Park to follow its own written policy requiring that a physician see and examine every patient who presented at the emergency room was evidence of [its] breach of its duty to provide reasonable care.

The testimony offered by Drs. Stone and Kern was also of specific importance, namely that the care provided was below the specific standard of care for emergency rooms looking at patients "with the same presentation" and that further information would have been gathered if the patient had been seen by a physician rather than a PA. Similar testimony was not elicited in this case.

Further, any error in limiting Dr. Markowitz's testimony was harmless when Plaintiff failed to offer an expert in the medical field to establish that he would not have lost his eyesight had he been examined by a medical doctor at the Hospital. Plaintiff asserts that Dr. Edmonds would have testified concerning the causation element for the direct liability claim had Dr. Markowitz's testimony not been stricken by the trial court. He submitted an offer of proof for the court's consideration, notably after Dr. Edmonds was no longer available for cross-examination. The Hospital asserts that such offer should not be considered by this court because Plaintiff did not disclose the offered testimony. A review of the record confirms this fact.

In the pre-trial disclosures, Plaintiff submitted that Dr. Edmonds expected to testify, inter alia, that "had a physician seen *and* properly evaluated [Plaintiff] during his emergency room visit, a delay in the necessary treatment would have been avoided and [Plaintiff] would not have suffered the complete loss of vision to his right eye." At trial, Plaintiff sought to establish that a violation of the Hospital's rules and regulations amounted to a breach in the standard of care and was the proximate cause of Plaintiff's injury. The evidence simply does not support this assertion when Plaintiff failed to offer any expert to establish that a physician, rather than a PA, would have diagnosed Plaintiff differently based solely upon his or her status as a physician. The late-filed affidavit submitted as an offer of proof also does not espouse this opinion. Instead, Dr. Edmonds attests as follows:

> Based on my review of [the applicable medical history], and my professional education, training and experience, and assuming that the opinions expressed in the affidavit of Hobson Bryant, PA are correct, I have concluded, within a reasonable degree of medical certainty, that as a proximate result of the negligent acts and omissions of [the PA] as opined by Mr. Bryant in his affidavit, including [the PA's] failure to do any radiographical diagnostic testing on [Plaintiff] or refer him immediately to

an ophthalmologist, [Plaintiff] suffered injuries which would not have otherwise occurred, namely the complete loss of vision and loss of [Plaintiff's] right eye. To wit, [the PA's] negligence resulted in a delay in the detection and treatment of [Plaintiff's] penetrating eye injury by a metallic foreign object, which delay resulted in the permanent total loss of vision in that eye and ultimately the loss of that eye.

Likewise, PA Bryant concluded that the PA in this case acted with less than ordinary and reasonable care and breached the applicable standard of care by failing either to order diagnostic testing or to refer Plaintiff to an ophthalmologist. Neither witness attested that the Hospital's failure to ensure examination by a physician was the cause of Plaintiff's total loss of vision. With the above considerations in mind, we affirm the court's limiting of Dr. Markowitz's testimony and its grant of directed verdict in light of such limitation.

## V.    CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Michael Surber.

_____
JOHN W. McCLARTY, JUDGE